**Adelaide Sharnee HARRIS, Plaintiff,**

v.

**Ralph E. BEEDLE, individually and as Executive Vice President of the Power Authority of the State of New York, John C. Brons, individually and as President and Chief Operating Officer of the Power Authority of the State of New York, and the Power Authority of the State of New York, Defendants.**

**No. 92 Civ. 7221 (GLG).**

United States District Court, S.D. New York.

March 10, 1994.

---

Charles M. Pratt, New York City by Sarah J. Berger and Arthur T. Cambouris, for the Power Authority of the State of N.Y.

Lovett & Gould, White Plains, NY by Jonathan Lovett, for plaintiff.

## OPINION

GOETTEL, District Judge.

Plaintiff Adelaide Sharnee Harris brings this cause of action against her former employers the Power Authority of the State of New York ("the Authority"), Ralph E. Beedle, the Authority's former Executive Vice President in charge of Nuclear Operations and John C. Brons, its former President and Chief Operating Officer. Plaintiff alleges that her termination constituted a violation of her First Amendment rights and, accordingly, brings this civil rights action pursuant to

42 U.S.C. § 1983. Defendants now move for summary judgment.

## FACTS

In November of 1987, plaintiff was hired by the Authority as a secretary in its New York Office. In May of 1991, plaintiff was promoted to the position of secretary to defendant Beedle and transferred to the Authority's White Plains office.

In April of 1992, plaintiff received a memorandum scheduling her for a Values Program training session. The Values Program was an internal program instituted by the Authority in January of 1992 to emphasize excellence, teamwork, integrity, and innovation. All employees were scheduled to attend a meeting to introduce the program.

Plaintiff did not attend her scheduled session on April 21, 1992 and left early from a session on Friday, April 24. She claims that she was not feeling well and that the other employees in attendance were laughing and making fun of the presentation. When Beedle saw her at her desk, he told her she should return to the session. Plaintiff refused, saying she had a headache.

Promotional buttons were made and distributed at the end of each training session along with literature which described the Values Program. The buttons, which were two inch square pins with the four values written on them, were given to employees to wear as a sign of support for the program.

Because she left her training session early, plaintiff did not receive a Values button. However, on April 27 or 28, 1992, she called Norah Holt, an employee in the Authority's Public Affairs Department and asked if she could have three promotional buttons. Holt dropped three buttons off on the 29th or 30th of April.

On April 30, 1992, when Salvatore Zulla, Vice President, Nuclear Engineering walked by plaintiff's desk, plaintiff told him that she had Values buttons. When Zulla said that he did not see the buttons, plaintiff pinned one button on each lapel and one button in the area of her stomach. At her deposition, plaintiff stated whether or not the top two buttons were placed over her breasts was a "matter [of] interpretation."

For approximately a half an hour, plaintiff walked around her floor and displayed the buttons to several Authority employees. According to plaintiff, as she walked around she made comments such as, "Here are my Values buttons," "What do you think of my Values buttons," "Check out my Values buttons," "Look I have my Values buttons," "Nice buttons, here's my buttons," and "I got my Values buttons on." According to plaintiff, her actions were meant to express her criticism of the Values Program which she felt was a waste of employee time and Authority money. During this time period, Authority employees gathered in the hallways discussing plaintiff's antics.

Beedle, who had been assigned to work at the James A. Fitzpatrick power plant ("JAF"), for a few days, was not in the office when plaintiff "made her statement." However, he was told of her actions at JAF by William Josiger, Vice President, Nuclear Operations on the afternoon of April 30th.

On May 1, 1992, Zulla and Beedle attended a previously scheduled meeting at JAF, and Zulla told Beedle that plaintiff had placed two Values buttons over her breasts and one over her pelvic area and stated "How do you like my values" and that plaintiff had also stated if she had more buttons, she would place them on her posterior. Later that day, Beedle spoke with Alan Weiser, Senior Vice President, Human Resources and told him that he was thinking of terminating plaintiff for inappropriate behavior.

On Monday, May 4, 1992, Beedle spoke with John Kelly, Director, Radiological Health and Chemical, who repeated Zulla's account of plaintiff's actions. Beedle then contacted Karen Caruso, Director of Employment and told her that he intended to terminate plaintiff due to her improper and offensive conduct. That morning, Beedle convened a meeting with plaintiff and Caruso at which he told plaintiff she was being terminated for inappropriate behavior.

On March 5, 1992 plaintiff wrote a statement for her personnel file which she also provided to Caruso and defendant Brons. In the statement, plaintiff wrote that she possessed a "joie de vivre, vitality, energy, sen-

suality, and sexuality that the Authority was not equipped to handle or deal with." In regard to her actions on April 30, she stated that she "always went out of her way to cheer up someone who was down or try to lighten up a dull or depressing situation" and "[t]hat [was] sort of what was going on ... during the 'button incident.'"

She explained her:

actions and words were extremely exaggerated by those who were not witnesses to the event or saw the buttons. Nothing I did was done to offend or intimidate any one person or Authority figure, nor done in any way to ridicule the Values Program. It was a bunch of people teasing and playing with each other. None of the persons I was laughing with seemed at all offended but instead seemed to be enjoying the whole thing. The incident was then taken out of context and viciously exaggerated by others.

Plaintiff met with Brons and his assistant Barbara Taggart during the week of May 4 but was not reinstated.

Plaintiff subsequently filed this civil rights case claiming that her First Amendment rights had been violated in two ways. First, she protests the requirement that she "subscribe to, profess concurrence with, and physically display her support for a publicly funded program with respect to which she disagreed," namely the Values Program. Second, she claims that she was wrongfully terminated for expressing her opinion about the Values Program.

**ANALYSIS**

Defendants argue that they are entitled to summary judgment because plaintiff's speech is not entitled to protection under the First Amendment. They also argue that Beedle and Brons are entitled to summary judgment because they are entitled to qualified immunity and because they were never properly served process. We note that summary judgment is proper where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c).

### A. *Harris's termination*

It is well settled that a state cannot condition public employment in a manner which infringes on an employee's First Amendment rights. *Branti v. Finkel,* 445 U.S. 507, 515–16, 100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574 (1980). (For purposes of this decision, we will treat the Power Authority as being an arm of the state without reference to any Eleventh Amendment considerations.) However, the Supreme Court has sought to "balance ... the interests of the [employee], as a citizen, in commented upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). This "reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government office could not function if every employment decision became a constitutional matter." *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983).

Applying its test in *Connick v. Myers,* the Supreme Court held, as a threshold matter, that it is unnecessary to scrutinize the reason for an employee's discharge if the employee speech which spurred the discharge could not be characterized as touching upon a matter of public concern. *Id.* at 146, 103 S.Ct. at 1689–90. Myers, the plaintiff in *Connick,* was a former Assistant District Attorney who circulated a questionnaire to fellow employees concerning office procedures in response to a job transfer. Although the district court found that Myers was terminated because of the questionnaire, the Supreme Court held that the questionnaire did not touch upon a matter of public concern except for one question which inquired if the assistant district attorneys felt pressured to work on political campaigns. *Id.* at 149, 103 S.Ct. at 1691.

Defendants argue that plaintiff's speech similarly did not touch upon public matters. In support of their position, they cite several cases holding that speech does not touch upon public matters when it reflects concern over policies solely affecting public workers.

*Ezekwo v. New York City Health & Hosp. Corp.,* 940 F.2d 775, 781 (2d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991); *Knowlton v. Greenwood Indep. School Dist.,* 957 F.2d 1172, 1178 (5th Cir.1992).

■ Plaintiff contends that she was speaking on a matter of public concern because she claims the Values Program, which allegedly cost over $200,000, was a colossal waste of public money. She attempts to tie the Values Program to several newspaper articles documenting waste and mismanagement at the Authority. These articles discuss Authority abuses such as lavish parties and executive raises and expense accounts. In her memorandum of law, plaintiff contends that she was "very much aware of" Authority mismanagement at its nuclear facilities and felt that the money spent on the Values Program could be better spent on maintenance and safety.

■ Whether employee speech addresses a matter of public concern is a question of law for the court to decide based upon "the content, form, and context of a given statement." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690; *Sheppard v. Beerman,* 18 F.3d 147 (2d Cir.1994); *Ezekwo,* 940 F.2d at 781. While we find that plaintiff was indeed expressing her disapproval of the Values Program by her actions, we do not find that her critical "speech" touched upon matters of public concern. Plaintiff attempts to tie her criticism of the program into a general critique of Authority mismanagement and waste. However, such "[a]bstract concern about a particular subject carries no weight if

the employee chooses not to articulate it." *Giacalone v. Abrams,* 850 F.2d 79, 87 (2d Cir.1988). Similarly, plaintiff's after the fact efforts to expand her grievance into a public issue is insufficient to make the subject of her speech a matter of public concern.

While there is some merit to plaintiff's claim that, implicit in her criticism of the Values Program was an allegation that it was a waste of taxpayer money, she succeeds in proving too much for every public employee's complaint about his or her work conditions is an indirect charge that the governmental employer is wasting money. Because plaintiff's approach would eradicate *Connick's* distinction between speech touching upon employment issues and speech regarding public matters, we decline to adopt her reasoning.

Plaintiff's papers assert that foul language was common at the Authority and that the conduct of her superiors often bordered upon sexual harassment. As such, she claims that it is disingenuous and hypocritical for defendants to claim that her conduct was deemed offensive. That may well be true. However, we reiterate, even if defendants' asserted reasons for terminating her are pretextual, plaintiff still fails to make out a civil rights claim because she was not fired for speech relating to a public concern.[1]

While defendants' actions may have been somewhat harsh, as the Supreme Court noted in *Connick,*

[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their of-

---

**1.** By post argument letter brief, plaintiff contends that a recent Second Circuit case, *Sheppard v. Beerman,* 18 F.3d 147 (2d Cir.1994), supports her argument that summary judgment is inappropriate here.

*Sheppard* involved a New York Supreme Court Justice's decision to terminate his law secretary after the secretary accused the Justice of judicial misconduct. Sheppard, the law secretary, alleged several civil rights claims which were dismissed on the pleadings. However, the Second Circuit reversed the court below as to Sheppard's claim that his termination violated the First Amendment. It held that the district court erred in determining the reason for Sheppard's termination was his insubordination rather than

the exercise of his free speech rights since Justice Beerman's motive for firing Sheppard was clearly a disputed issue of fact. *Id.* at —. The Second Circuit also held that the district court impermissibly allowed its determination of insubordination to impact on its finding that Sheppard's speech did not touch on matters of public concern which judicial misconduct clearly is. *Id.* at —.

Despite plaintiff's valiant arguments, we find *Sheppard* altogether distinguishable from the case at hand, and we reiterate whether or not plaintiff was fired for expressing her views on the Values Program is immaterial because her speech did not touch upon matters of public concern.

fices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Id.*, 461 U.S. at 146, 103 S.Ct. at 1690.[2]

Therefore, we must grant defendants' motion for summary judgment as to plaintiff's claim that her termination violated her rights under the First Amendment.

B. *Forced subscription to the Values Program*

Plaintiff begins her argument with the uncontroverted premise that the state cannot dictate thought or expressive behavior. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). She then asserts that the Values Program is unconstitutional because "government employees were expected to subscribe to company imposed behaviors" and because they were required to express support for the values espoused by the program.

In order to put plaintiff's claim in perspective, we must examine the Values Program. The program did not touch upon socially divisive issues such as political affiliation, religion, or support for organized labor. The four values espoused by the Values Program were: excellence, innovation, integrity and teamwork, and we note that there is no evidence that the Authority encouraged its employees to endorse these values outside of the workplace.[3]

1. *"Forced behaviors"*

 Starting with plaintiff's first allegation, we find nothing improper with the Au-

thority requiring that its employees behave in a manner consistent with the Values Program. Plaintiff attempts to cloud our analysis by consistently referring to required "behaviors," "values" and "cultures" "considered acceptable to the Authority." While discussing the Values Program in such abstract terms makes it appear constitutionally suspect, a closer examination of the program shows that the Authority simply encouraged four values on the job: excellence, innovation, integrity and teamwork. Disposing of the business school rhetoric, it is clear that the Authority was simply requiring that its employees strive towards doing a good job. Indeed, the Authority's performance review process evaluated employees in such areas as initiative, original thinking, high work quality, and participation in group projects at least as far back as 1986.

The essence of the employer-employee relationship is that employees do certain actions at the behest of their employers in order to receive a wage. As in the termination context, a distinction must be made between impermissible behavioral requirements which are unrelated to an individual's employment, such as the performance of a religious ritual or contribution to a political campaign, and requirements which are part and parcel of an employee's job function. We hold that government employers are allowed to encourage good performance from their employees. Indeed, arguing that the state does not have the ability to encourage its employees to strive towards excellence, innovation, integrity and teamwork in their job performance is not only absurd, it also shows grave disrespect for the many government workers who perform their jobs with pride. Thus, we grant defendants' motion for summary judgment as to plaintiff's claim that defendants' attempts to have her perform her job in the spirit of excellence, inno-

---

**2.** Even where employee speech is found to touch on matters of public concern, which we find has not occurred here,

> [w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, [there is no] necessity for an employer to allow events

to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692.

**3.** Apparently, Authority employees are free to strive towards dishonesty, discord, and mediocrity during their free time.

vation, teamwork, and integrity violated her First Amendment rights.

### 2. *"Forced support" of the Values Program*

■ Plaintiff's second allegation challenges the Authority's requirement that employees express support for the Values Program. She asserts that employees were wrongfully forced to attend Values training programs and to wear Values buttons. While we agree with plaintiff that wearing a button can constitute speech protected under the First Amendment, *U.S. Justice Dep't v. F.L.R.A.*, 955 F.2d 998, 1006 (5th Cir.1992); *Burnside v. Byars*, 363 F.2d 744, 747 (5th Cir.1966), we are not convinced that plaintiff has established that she was forced to wear a Values button.

In support of her position that donning a button was required, plaintiff argues that the buttons were distributed at mandatory training sessions. She also refers to language in an article in the Authority newsletter which quotes Brons. The article states "As 'role models,' [Brons] declared, managers must live by these values and 'wear them with pride' before they can hope to inspire others to assimilate the four goals." We disagree with plaintiff that Brons's statement can be reasonably interpreted as a requirement that all employees wear promotional buttons.

Plaintiff asserts that she was repeatedly asked by Authority executives, Sal Zulla and Bill Josiger, and coworkers why she was not wearing a Values button. She further states that she observed numerous Authority employees wearing buttons and overheard Beedle asking an engineer why he was not wearing a button and watched as he pinned one on him. In spite of plaintiff's valiant attempts to manufacture an issue of fact as to whether or not employees were required to wear the Values buttons, we find that no reasonable trier of fact could find that employees were required to wear the buttons.

We note that neither Zulla nor Josiger supervised plaintiff, nor is there evidence that Beedle ordered plaintiff to wear a but-

ton. Further, although buttons were distributed at mandatory training sessions, plaintiff was not even required to take one when she walked out of the training session (indeed it was she who later called Norah Holt to ask for buttons). Finally, despite plaintiff's creative reading of the Authority newsletter, there is no evidence of any directive from management that employees wear the buttons.

■ Plaintiff argues, even if she was not forced to wear the buttons, defendants' attempts to force her to attend the Values training program and to profess ideological concurrence with the Values Program violated the First Amendment. Again, we disagree with plaintiff.

■ While plaintiff is correct that the state cannot force its employees to espouse a certain ideology, a distinction must be drawn between political, religious, and social values which have no relation to job function and values which strictly relate to job performance and lack such content. In the former case, the state clearly cannot force an employee to espouse ideological values which are irrelevant to his or her performance. However, based upon the Supreme Court's reasoning in *Connick*, we hold that a public employer can encourage its employees to espouse values essential to the performance of high quality work which lack religious, political and social content.

As we discussed earlier, defendants' Values Program clearly falls within the second category. The program was no more than an attempt to encourage Authority employees to do a good job and did not require that employees incorporate the values into their lives outside their work. Because encouraging an employee to adopt the values of excellence, integrity, innovation, and teamwork on the job lacks ideological content and is so clearly tied to an employee's on the job performance, we grant defendants' motion for this claim as well.[4]

---

4. Defendants note that plaintiff's approach could also be used to challenge employee training sessions on such topics as safety, productivity, diver- sity issues, and the prevention of sexual harassment.

In summary, defendants' motion for summary judgment is granted in full. Because we hold that plaintiff has failed to establish a genuine issue of material fact in support of her claims, we need not reach whether defendants Beedle and Brons are also entitled to judgment due to qualified immunity and/or defective service of process. The clerk shall enter judgment.

SO ORDERED.