**Eugene IANNILLO, Plaintiff,**

**v.**

**COUNTY OF ORANGE, Margaret Kirchner, Commissioner of the Orange County Department of Social Services, Shawn Yetter, Deputy Commissioner of the Orange County Department of Social Services, David M. Smith, Ad-**

ministrative Officer of the Orange County Department of Social Services, and Hattie Peterson, Director of Economic Independence of the Orange County Department of Social Services, Defendants.

No. 00 Civ. 5072(WCC).

United States District Court, S.D. New York.

Feb. 25, 2002.

Law Offices of Robert N. Isseks, Robert N. Isseks, Of Counsel, Law Offices of Alex Smith, Middletown, NY, Alex Smith, Of Counsel, for Plaintiff.

Catherine M. Bartlett, County Attorney, Orange County, Attorneys for Defendants County of Orange, Margaret Kirchner, in her official capacity as Commissioner of the Orange County Department of Social Services, Shawn Yetter, in his official capacity as Deputy Commissioner of the Orange County Department of Social Services, David M. Smith, in his official capacity as Administrative Officer of the Orange County Department of Social Services, and Hattie Peterson, in her official capacity as Director of Economic Independence of the Orange County Department of Social Ser-

vices, Goshen, NY, Susan I. Wegner, Senior Asst. County Attorney, Of Counsel.

Drake, Sommers, Loeb, Tarshis & Catania, PLLC, Attorneys for Defendants Margaret Kirchner, in her individual capacity, Shawn Yetter, in his individual capacity, David M. Smith, in his individual capacity, and Hattie Peterson, in her individual capacity, Newburgh, NY, Denis E. McGuinness, Steven I. Milligram, Of Counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Eugene Iannillo brings the instant action pursuant to 42 U.S.C. §§ 1981, 1983 against defendants County of Orange (the "County"), Margaret Kirchner, individually and as Commissioner of the County Department of Social Services (the "Department"), Shawn Yetter, individually and as Deputy Commissioner of the Department, David M. Smith, individually and as Administrative Officer of the Department and Hattie Peterson, individually and as Director of Economic Independence of the Department. Plaintiff alleges that he was terminated from the Department in retaliation for exercising his First Amendment right of free speech. Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56(b). For the reasons that follow, defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise indicated. In 1999 the Department announced openings for the position of Social Welfare Examiner Trainee ("Trainee"). (Indiv. Defs. Rule 56.1 Stmt. ¶ 1.) The announcement specified the following qualifications for the position:

Working knowledge of investigation techniques including interviewing proce-

dures and practices; working knowledge of Federal, State, and Local Laws, Codes, and Policies concerning the provision of Social Welfare Programs; working knowledge of other laws, codes, and programs relating to the provision of Human Services; ability to communicate both orally and in writing; ability to relate to others under stressful conditions; ability to read and understand moderately complex written information; ability to analyze obtained information and determine its pertinence to eligibility programs; good powers of observation and perception; initiative; tact; patience; good judgment; physical condition commensurate with the demands of the position.

(McGuinness Aff., Ex. C.) Plaintiff was hired as a Trainee and began his employment on February 22, 2000. (Indiv. Defs. Rule 56.1 Stmt. ¶ 2.) As a Trainee, plaintiff was to undergo one year of training, including classroom instruction, seminars, mock interviews and other on the job training. After successful completion of the program, plaintiff would become a permanent Social Welfare Examiner ("Examiner"). (*Id.* ¶¶ 3–4.) Plaintiff was included in a group of five trainees, and was trained primarily by Scott Imhof, a senior Examiner for the Department, Sabina Shapiro, a Trainer for the Department and Carol Graybow, a Supervisor for the Department.

Within the first few weeks of the training period, Graybow conducted an orientation meeting with the Trainees during which Imhof and Shapiro were present. (*Id.* ¶ 7.) Plaintiff alleges that Graybow informed the Trainees that she planned to conclude the formal training within three or four months, at which time they would be assigned to offices to continue their on-the-job training. (Iannillo Dep. at 12–13.) Plaintiff interjected that he did not think

the proposed training period would adequately prepare him for his position and that he felt it unfair that the previous group of Trainees were allowed more time. (Indiv. Defs. Rule 56.1 Stmt. ¶ 9.) Graybow attempted to reassure plaintiff and the group that they would be given adequate training and that the training period would not conclude until they were prepared. (*Id.* ¶ 11.) Defendants argue that despite these reassurances, plaintiff made repeated objections which caused a disruption in the meeting as plaintiff and Graybow argued. (Oster Dep. at 16; Competelli Dep. at 49–55.) Plaintiff denies that his conduct was disruptive, but at least one of plaintiff's fellow trainees, Mary Oster, stated that she felt very uncomfortable during the exchange. (Oster Dep. at 16.) A few days after the orientation meeting, Graybow met with Peterson and informed her that plaintiff questioned the training timetable and that she was concerned that "someone who had only been in training a couple of weeks would voice—would be that disruptive, would interrupt me and say that what I was indicating to him was incorrect or improper." (Peterson Dep. at 9.)

One of the primary responsibilities of an Examiner is to interview people who apply to the Department for public assistance. During the initial interview, the applicant completes several forms, including a state-mandated screening form used to determine if an applicant should consult with a professional drug and alcohol counselor. (Indiv. Defs. Rule 56.1 Stmt. ¶¶ 15, 17.) The counselor then determines if the applicant needs additional drug and alcohol treatment. (*Id.* ¶ 16.) The Examiner's role in this process is to assist the applicant in completing the required paperwork and to make the appropriate referral to a drug and alcohol counselor if indicated by the screening form. (*Id.* ¶ 18.) If the applicant answers two or more of the questions on the form "yes," the Examiner is required to refer the applicant to the counselor. (*Id.* ¶ 22.) The Examiner is not charged with determining whether or not the applicant has a drug or alcohol problem; that decision is solely within the province of the counselor. (*Id.* ¶ 20.)

On March 14 and 16, 2000, Imhof conducted a mock interview session with the Trainees during which he posed as a hypothetical welfare applicant with a potential substance abuse problem. Defendants allege that plaintiff objected to the state-mandated screening form based on his experience as an owner of a bar, stating that the form did not indicate whether or not a person had a drug or alcohol problem and that it should probably not be used. (*Id.* ¶ 24.) Defendants contend that plaintiff's comments were disruptive and indicated a lack of understanding of the Examiner's function. Plaintiff concedes that during the training session, in response to Imhof's query as to whether he contested the form's validity, he stated that he was "friends with an attorney, a Supreme Court justice on the bench for forty years who would answer two of these questions yes, does that mean that man had a problem, should we refer him?" (Iannillo Dep. at 350.) Plaintiff stated that he also knew accountants that frequent his bar who would be referred for counseling under the form, and that because he "see[s] problems every day with people . . . I'm probably more in tune with it than many of the examiners, all of the examiners put together . . . [and that] [i]f I feel the man has a problem, I'll refer him to the alcohol counselor." (*Id.* at 351–52.) Plaintiff contends, however, that he did not question the validity of the form and that his comments were made in jest and were not disruptive to the training. (*Id.* at 354.)

The incident was relayed to Graybow by Imhof. (Imhof Dep. at 20–21.) Graybow

then notified Peterson that plaintiff objected to the use of the screening form based on his experiences as a bar owner. (Peterson Dep. at 13.) On March 17, 2000, Imhof conducted his first evaluation of plaintiff. (Smith Aff., Ex. 2.) Imhof conveyed to plaintiff his concern that plaintiff would be unable to make appropriate referrals if he had "preconceived feelings or attitudes about the use of the [screening form]." (Isseks Aff. ¶ 25.) In his notes, Imhof wrote that "[a]lthough [plaintiff] asks relevant questions, [he] sometimes objects on 'policies/situations' beyond the control of line workers and supervisors." (Smith Aff., Ex. 3.)

On April 6, 2000, the Trainees attended a state-sponsored domestic violence training seminar with approximately thirty additional Trainees from various counties. The objective of the session was to demonstrate to the Trainees when and how an Examiner makes a referral to the Department's domestic violence liaison personnel. (Indiv. Defs. Rule 56.1 Stmt. ¶ 29.) The session was designed to put the Trainees on alert for potential domestic violence situations and to depict the impact of domestic violence on the client. (Id. ¶ 30.) A referral was required by state mandate if indicated by information provided by the client on the domestic violence screening form or if the Examiner had reason to believe a potential domestic abuse situation existed. (Id. ¶ 31.) The role of the Examiner is strictly limited to referring the potential domestic violence victim to a qualified professional, who would then make a determination whether there was domestic abuse. (Id. ¶ 32.)

During the training session, a film entitled "It's Not O.K." was shown depicting five different scenarios of domestic abuse, ranging from severe physical abuse to less severe emotional abuse. (Id. ¶ 34.) At the conclusion of the film, the trainer asked the participants what the five scenarios had in common. (Id. ¶ 36.) Plaintiff volunteered that "we only heard one-half of the story." (Iannillo Dep. at 18.) Many of the attendees were offended by plaintiff's comments and, by plaintiff's own admission, the "meeting erupted and I was verbally abused by a number of women in the audience." (Id.; Indiv. Defs. Rule 56.1 Stmt. ¶ 38.) Defendants argue that following the initial comment, plaintiff was loud and disruptive, and that no further meaningful discussion of the video was possible. Plaintiff disputes that his comments were disruptive of the session.

Shortly after the incident at the domestic abuse session, Imhof, Graybow and Shapiro reported to Peterson. (Indiv. Defs. Rule 56.1 Stmt. ¶ 42.) Peterson was informed of plaintiff's comment and told that "[plaintiff] was very disrupt[ive] and the people in attendance was (sic) shocked that he made the comment," that "[plaintiff] kept interrupting ... the training by trying to explain what he meant" and that "several people that had attended training were embarrassed by his statement." (Peterson Dep. at 15–16, 20.) Peterson testified that she then met with Yetter, Kirchner, Smith and Ana Finkle, Graybow's supervisor.[1] (Indiv. Defs. Rule 56.1 Stmt. ¶ 43; Peterson Dep. at 21.) During the meeting, Finkle recounted the April 6th incident at the training session. (Peterson Dep. at 23.) Peterson added that she "was amazed at the fact that anyone could make

---

1. There is conflicting evidence as to the number of meetings held and the exact parties present. For the purposes of this motion, any reference to the meeting will include all information exchanged during the meeting or meetings. Furthermore, because we must construe the evidence in the light most favorable to plaintiff, we will assume that Yetter, Kirchner, Smith and Peterson were present at the meeting.

that statement." (*Id.*) Peterson alleges that she then discussed two other incidents reported to her, specifically, plaintiff's questioning the adequacy of the training timetable and the validity of the alcohol and drug screening form. She is resolute, however, that she considered the April 6 incident most egregious. (*Id.* at 24.) Some time thereafter, perhaps following a second meeting, Peterson recommended and received approval from Kirchner to terminate plaintiff. (Indiv. Defs. Rule 56.1 Stmt. ¶ 44.) In her deposition testimony, Kirchner testified that she could not recall any discussions regarding the training timetable or screening form, but that "[Yetter and Peterson] did state that there were other issues, that they felt that he was not a candidate for a permanent appointment but the one I recall, the specific example is the domestic violence one." (Kirchner Dep. at 11.) Yetter testified that the recommendation to Kirchner to terminate plaintiff was made because plaintiff did not exhibit the necessary qualities for an Examiner, that "[plaintiff] was showing a high level of argument against basic rules and regulations that we're mandated to follow and he was very persistent in his argument on some of those rules and regulations." (Yetter Dep. at 17.)

Plaintiff received his notice of termination on April 19, 2000. (Indiv. Defs. Rule 56.1 Stmt. ¶ 45.) The notice gave plaintiff the opportunity to appeal the decision to Smith. (*Id.* ¶ 46.) Plaintiff met with Smith on April 24, 2000. (*Id.* ¶ 46.) Smith explained that plaintiff's termination was based on the three aforementioned incidents, and that the trainers and supervisors believed his conduct indicated that he was not fit to deal with the public. (*Id.* ¶¶ 48–49.) With respect to the training timetable, plaintiff explained that "we were going to be cut down from six months to three months ... [and that he] was concerned that a three-month period would

not ... adequately prepare [him for his] position." (Iannillo Dep. at 12–13.) When asked to explain the confrontation regarding the drug and alcohol screening form, plaintiff stated that he was "not really questioning the validity of the drug/alcohol statement, [but was just] ... trying to learn here." (*Id.* at 17.) With respect to the domestic violence session, plaintiff reiterated his comment that the video represented only half of the story. (*Id.* at 18.)

On April 25, 2000, plaintiff received a letter stating that the Department reviewed the information and statements provided at that April 24th meeting and decided not to reconsider their decision to terminate plaintiff. (Smith Dep. at 62.) Smith explained at his deposition that

> I reviewed what Shawn [Yetter] and Gene [Iannillo] said about the three incidents including some quotes [Iannillo] made to me about the domestic violence being six and a half hours of male bashing and the domestic violence instructor being anti-male. Him (sic) alleging that he had more experience than our whole ... department with the public. Those quotes showed me we made the right decision regarding Mr. Iannillo's employment.

(*Id.* at 63.)

Plaintiff filed the instant action on July 11, 2000, alleging that defendants terminated him in violation of the First Amendment. Specifically, plaintiff alleges that, in addition to the three instances specified by defendants, he was terminated because of comments made regarding the Department's treatment of clients residing in the Village of Kiryas Joel, New York ("Kiryas Joel clients"), a predominately Hassidic community. (1st Am.Complt.¶ 26.) During training, plaintiff and Oster uncovered suspicious activity relating to the Kiryas Joel file. (Indiv. Defs. Rule 56.1 Stmt. ¶ 50; Iannillo Dep. at 265.) They discovered that, regardless of the employer, many of

the Kiryas Joel clients reported weekly income of approximately $180, the maximum amount entitling the client to maximum welfare benefits. (Iannillo Dep. at 265; Imhof Dep. at 41.) In one particular instance, a Kiryas Joel client claimed to make $180 per week when the individual's bank statements showed approximately $2,600 worth of activity in the past two or three weeks. (Imhof Dep. at 41.) Plaintiff and Oster brought the discrepancy to Imhof's attention during a meeting with the other Trainees. (Oster Dep. at 10.) Imhof responded that it was a "good catch," and that they should refer the case to the Special Investigations Unit ("SIU"). (Indiv. Defs. Rule 56.1 Stmt. ¶ 51.) Imhof confirmed that the Trainees were able to refer a case to the SIU if they found suspicious activity. (*Id.* ¶ 52.) Over Imhof's denial, plaintiff alleges that Imhof also stated that the disputed wage reports had been around for a long time, that everyone knew about the alleged fraud, and that, more than likely, nothing would be done about it. (Iannillo Dep. at 268–69.) Patricia Competelli, plaintiff's fellow Trainee, recalls that Imhof informally told the group that "the Kiryas Joel organization is treated differently than everyone else, because they do have lots of advocates and they have a great deal of political power." (Competelli Dep. at 122.) Plaintiff argues that he informed Imhof of the discrepancies regarding the Kiryas Joel clients on at least ten additional occasions leading up to the time he was terminated. (Iannillo Dep. at 308.) Plaintiff's comments regarding the Kiryas Joel clients were not raised during the April 24th meeting and were not explicitly stated as a reason for plaintiff's termination.

## DISCUSSION

### I. *Summary Judgment Standard*

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 254 (E.D.N.Y.1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali*, 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.*, 947 F.2d 1021, 1022 (2d Cir.1991).

### II. *Section 1983 First Amendment Claim*

In order to prevail on a § 1983 freedom of speech claim, plaintiff must demonstrate by a preponderance of the evidence that: 1) the speech at issue is protected; 2) that he suffered an adverse employment action; and 3) that the speech was at minimum a substantial or motivating factor in the adverse action taken by the employer. *See Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993).

 For speech to be protected under the First Amendment, it must first relate to "any matter of political, social or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Therefore,

> [w]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684. After determining that the speech addresses a matter of public concern, the court must then balance the "interests of the employer in providing 'effective and efficient' public services against the employee's First Amendment right to free expression." *Lewis v. Cowen,* 165 F.3d 154, 161 (2d Cir.1999), quoting *Connick,* 461 US. at 150, 103 S.Ct. 1684, citing *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As the Second Circuit explained the *Pickering* test,

> the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression, and the court must thus perform a balancing analysis, measuring, *inter alia,* the extent to which the employee's speech touched upon matters of public concern against the extent to which the employee's conduct interfered with the functioning of the workplace. Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to

comment on that is entitled to little weight in the balancing analysis.

*White Plains Towing Corp.,* 991 F.2d at 1059 (quotations and citations omitted). In balancing the interests, the court should consider whether the disputed statement "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). The employer carries the burden of demonstrating interference with government operations. *Lewis,* 165 F.3d at 162. However, the state need show only a "likely interference" with its operations and "not an actual disruption." *Id.* at 162.

 The "manner, time, and place" in which the disputed speech occurs is important in determining whether it is protected. *See id.* (explaining that "the Pickering balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers"). The *Pickering* balance will vary depending upon the content of the speech. "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Id.* at 162. The balance will also be affected by the nature of the employee's responsibilities. "[T]he more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy v. Spencer,* 124 F.3d 92, 103 (2d Cir.1997).

 Finally, "if the employee succeeds in demonstrating that his speech is constitutionally protected under *Pickering,* he

must then prove that the speech was a substantial or motivating factor in the adverse employment action." *Lewis*, 165 F.3d at 163. Once the employee satisfies his *prima facie* case, the employer may still avoid liability by establishing, by a preponderance of the evidence, that it would have taken the same employment action in the absence of the protected speech:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*White Plains Towing Corp.*, 991 F.2d at 1059; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

### A. *Speech on Matter of Public Concern*

 "Whether a particular instance of speech relates to a matter of public concern is a question of law to be answered by the Court," *Rao v. New York City Health & Hosps. Corp.*, 905 F.Supp. 1236, 1241 (S.D.N.Y.1995), and is "determined by the content, form and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. In making its determination, the court should focus on the motive of the speaker, attempting to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. *Lewis*, 165 F.3d at 163–64.

Defendants argue that plaintiff's statements regarding the adequacy of the training period, the wisdom of the alcohol screening form, the content of the training video and the apparent corrupt department-wide policy promoting favoritism towards Kiryas Joel clients were purely personal in nature. Plaintiff argues that all his statements were critiques of management's competency and were therefore protected under the First Amendment. (Pl. Mem. Opp. Summ. J. at 3.) Plaintiff explains that his "questions and remarks . . . all impacted, to one degree or another, on the public welfare, in that they concerned the operation and management of the Department of Social Services, a public agency, and they had absolutely nothing to do with Iannillo personally." (*Id.* at 4.)

 While we agree with plaintiff in part, his argument sweeps far too broadly. To determine whether a given statement relates to a matter of public concern, a court must consider the context and circumstances under which the statement was made. *See Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. The key inquiry is whether the comment was made by plaintiff in his role as a disgruntled employee or in his role as a private citizen. *Id.* at 146, 103 S.Ct. 1684. In *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir.1991), the plaintiff, a medical doctor, authored a series of verbal complaints, letters and memoranda to the director of the medical residency program. The complaints concerned several areas of personal dissatisfaction including, *inter alia*, the lack of personal attention she received from the attending physicians, the lack of proper hospital maintenance, the director's poor management and motivational skills and the poor teaching methods of the attending physicians. When the plaintiff was denied the position of Chief Resident, she brought suit for First

Amendment retaliation. The Second Circuit held that

> [h]er complaints were personal in nature and generally related to her own situation within the ... residency program. Our review of her prolific writings convinces us that Ezekwo was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor.... To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case.... [T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id.* at 781, quoting *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. The court further stated that "the mere fact that one or two of [plaintiff's] comments could be construed broadly to implicate matters of public concern does not alter the general nature of her statements." *Ezekwo*, 940 F.2d at 781; *see also Harris v. Beedle*, 845 F.Supp. 1030, 1034 (S.D.N.Y.1994) (holding that plaintiff's argument that implicit in her criticism of her public employer's training session was an allegation that it was a waste of taxpayer money "would eradicate *Connick's* distinction between speech touching upon employment issues and speech regarding public matters"). In another instructive case, *Hellstrom v. United States Dep't of Veterans Affairs*, 178 F.Supp.2d 164 (N.D.N.Y.2001), plaintiff argued that her statement, "I have not made an effort to hire minorities. I am personally not a believer in affirmative action," during an investigation into complaints that plaintiff made discriminatory comments about a job applicant was protected speech. In holding that the state-

ment was not a matter of public concern, the court noted that

> [i]n the abstract, the issue of affirmative action is certainly a matter of public concern. However, under the circumstances of this case, Plaintiff's statement about his personal opposition to affirmative action must be viewed in the context in which it was made—as a personal response to charges of discrimination leveled against him. Viewed in this light, Plaintiff's statement clearly was made in his capacity as an employee who was speaking about a matter of purely personal interest, rather than as a citizen concerned with a matter of public import.

*Id.* at 169.

### 1. *Plaintiff's Speech Relating to the Length of the Training Period*

We conclude that plaintiff's complaints regarding the proposed length of the training period do not indicate a matter of public concern. When told of the proposed reduction in training to three or four months, plaintiff responded to Imhof that "I don't think that's fair. I don't think we'll be adequately trained. The other people had five months to go over all that, you're telling us now that we're going to do it in three. I'm here a month so far, all I know is where the bathrooms are." (Iannillo Dep. at 171.) While plaintiff's concerns may indeed have been justified, there can be no doubt that they were made in his role as an employee expressing dissatisfaction with his employer's training procedures. Furthermore, the speech was not made public and was voiced only within the confines of the training program to Department employees. To characterize such a complaint as relating to a matter of public concern merely because plaintiff was training for a position that interacts

with the public would turn virtually every internal complaint by a public employee into protected speech. *See Ezekwo,* 940 F.2d at 781. We decline to expand the protections of the First Amendment to such a degree and grant defendants' motion for summary judgment with respect to this issue.

### 2. *Plaintiff's Speech Relating to the Drug/Alcohol Screening Form*

■ We similarly conclude that plaintiff's comments regarding the drug and alcohol screening form did not relate to a matter of public concern. Plaintiff testified that his comments were not directed to the validity of the form, and were in fact made in a joking manner. (Iannillo Dep. at 350–54.) Plaintiff argues that his comments were "a matter of public concern ... because I'm trying to do a job for the people of Orange County and if I'm not trained properly ... I'm denied knowledge to effectively do my job...." (Iannillo Dep. at 23–24.) Contrary to plaintiff's arguments, the evidence demonstrates that the questions were not made as a citizen addressing a public concern, but reflect an employee's attempt to understand the appropriate use of the referral form. (Iannillo Dep. at 17 ("And I said, 'I'm not really questioning the validity of the drug/alcohol statement, I'm trying to learn here.' ").) In fact, had plaintiff's comments been directed towards the form's validity, his argument that the statements involved a matter of public concern would be more persuasive. Here, however, plaintiff's comments were made in his role as an employee and were motivated by a desire to understand the form and are therefore insufficient to support a claim for a First Amendment violation simply by virtue of the fact that plaintiff was training for a job that could potentially impact the public. Accordingly, defendants' motion for sum-

mary judgment that plaintiff's comments regarding the screening form do not address a matter of public concern is granted.

### 3. *Plaintiff's Speech at the Domestic Violence Training Program*

■ Although the issue is somewhat less clear, we find that plaintiff's comments at the domestic violence training program did not implicate matters of public concern. During his deposition, plaintiff was asked what he meant by his comment that the training video only depicted one half of the story:

Q. All right. Now, you indicated that you told her you only saw half of the story. What half of the story did you feel the film didn't tell?

A. The man's half, because each instance was a female being abused. Never one instance was there a male being abused.

 * * * * * *

Q. Other than that, did you mean anything else?

 * * * * * *

A. Oh, mean anything else. That we only heard one-half of the story. I didn't mean anything else.

 * * * * * *

Q. And do you feel the abuser's story should have in each instance been told?

A. I didn't necessarily feel that his or her or in this case his side of the story should have been told. I just answered the question what was in common in all five scenarios, and that's what I thought was in common.

(Iannillo Dep. at 373–75.) While domestic violence issues are certainly a matter of

public concern, based on plaintiff's own testimony, we are unable to conclude that plaintiff's motivation in making the disputed comment was anything other than to answer the question posed. The evidence simply does not support a finding that he was using the training session as a forum to make a statement challenging the manner in which domestic violence issues are treated. Accordingly, we conclude that under the circumstances plaintiff's statement was made in his role as a Trainee answering a question posed by a trainer and not as a private citizen addressing matters of public concern. *See Hellstrom*, 178 F.Supp.2d at 168. Furthermore, assuming *arguendo* that plaintiff's comments did relate to a matter of public concern, the comment would undoubtedly not merit protection under the *Pickering* test. Plaintiff's statement was not made in public but rather during a training session for Department employees and, by plaintiff's own admission, it caused the meeting to erupt and resulted in several other participants being offended. (Iannillo Dep. at 379.) Therefore, defendants' interests in maintaining a harmonious and efficient workplace far outweigh whatever minimal public concern plaintiff's speech may have implicated, and defendants' motion for summary judgment with respect to this comment is granted. *See White Plains Towing Corp.*, 991 F.2d at 1059.

### 4. *Plaintiff's Speech Relating to Kiryas Joel*

 We conclude that plaintiff's alleged comments relating to the favorable treatment of Kiryas Joel clients did involve a matter of public concern and is protected under the First Amendment. Defendants argue unpersuasively that plaintiff's comments "were made only in the context of his ministerial duties as an examiner" and that "[h]e was simply voicing his uninformed suspicions to his trainer that there appeared to him to be irregularities and that some recipients from Kiryas Joel might not be eligible for assistance." (Indiv. Defs. Mem. Supp. Summ. J. at 13.) On the contrary, plaintiff's complaints were based on a review of the application forms for welfare assistance and were corroborated by Oster's contemporaneous and independent review of Kiryas Joel applications. Furthermore, upon being informed of their findings, Imhof responded that it was a "good catch," and that it was appropriate for referral to the SIU. Unlike the statements underlying our previous findings, plaintiff's comments were made in his role as a private citizen exposing a potential abuse in the allocation of public funds. Plaintiff stated that he believed that Kiryas Joel clients were being unfairly favored by the Department. In one exchange, plaintiff alleges that he asked Imhof:

A. "If this client was a black person from Lander Street and we noticed this unusual activity and made a referral to SIU, would they do something about it then?"

Q. And what did Scott say back?

A. He said, "They would."

(Iannillo Dep. at 327.) Plaintiff's comments were not related to any personal employment matters, but instead addressed an issue of utmost public concern: potential abuse of the welfare system with the complicity of the Department. (Iannillo Dep. at 37) (plaintiff stated that "I think there are certain people here ripping the county off."); *see Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130 (2d Cir.1999). Moreover, plaintiff's alleged comments warrant protection under the *Pickering* balancing test. While plaintiff's comments were made internally within the Department to Department employees, they addressed a matter of the highest public concern and were disruptive to the

Department only to the extent Department officials sought to suppress exposure of potential abuses. *See id.* at 140; *Gorman–Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 553 n. 4 (2d Cir.2001) (holding that mismanagement of government funds was clearly a matter of public concern). Accordingly, defendants' motion for summary judgement dismissing plaintiff's § 1983 claim with respect to this issue is denied.

### B. *Substantial or Motivating Factor*

To establish a prima facie case of First Amendment retaliation, plaintiff must also show that the speech at issue was "at least a substantial or motivating factor for the employer's adverse employment action." *Ezekwo*, 940 F.2d at 780. Causation may be established either directly or "indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment action." *Id.* at 110.

Defendants' move for summary judgment, arguing that there is no evidence that any of the defendants even knew of plaintiff's alleged comments regarding the Kiryas Joel comments. While defendants' arguments are not clearly without merit, we conclude that plaintiff has adduced sufficient evidence of causation to survive summary judgment. When plaintiff was questioned as to why he thought he was terminated for the comments made regarding Kiryas Joel, he responded that "the day I got fired, I went in to say good-by to [Imhof] and he said "Gene, I told you to keep your mouth shut. It's a shame. We need more men around

here. You were going to be a good examiner." " (Iannillo Dep. at 37.) Similarly, Patricia Competelli, plaintiff's fellow Trainee, testified that when she asked Imhof why plaintiff had been terminated, Imhof responded that plaintiff "ran into more than one occasion where there were a few incidents that were not in his favor or favorable incidents ... and he just basically voiced his opinion a little too much." (Competelli Dep. at 136–37.) We recognize that these alleged statements are entirely consistent with defendants' assertion that plaintiff was fired for the reasons stated at the April 24th meeting. However, they are also consistent with plaintiff's argument that he was fired for exposing the Department's policy of favoritism towards Kiryas Joel clients. Plaintiff also alleges that he made repeated complaints up to the time when he was fired, but presents no direct evidence that he made any of his alleged comments in the defendants' presence or that Imhof informed the defendants' of his comments. Nonetheless, under the circumstances, we cannot conclude as a matter of law that no reasonable jury could infer that defendants, who apparently were Imhof's superiors, were made aware of plaintiff's comments by Imhof and that they were subsequently motivated by such comments. We express no views as to plaintiff's chances of success at trial, and decide only that there is a material issue of fact as to causation that renders summary judgment inappropriate at this time.

### C. *Termination in the Absence of the Alleged Protected Speech*

A government employer may avoid liability, even where there is evidence of protected speech, "if it can show by a preponderance of the evidence that it would have undertaken the same disciplinary action in the absence of the protected

speech." *Pappas v. Giuliani,* 118 F.Supp.2d 433, 444 (S.D.N.Y.2000). Defendants argue that the evidence establishes that plaintiff would have been fired for legitimate reasons. However, just as we are unable to determine whether plaintiff's protected speech was a substantial or motivating factor in his termination, we cannot now conclude that he would have been terminated even in the absence of the protected speech.

### D. *Municipal Liability*

 Defendants argue that plaintiff's § 1983 claim against the County and individual defendants in their official capacities must be dismissed because plaintiff cannot establish municipal liability. "A municipality may not be held liable in an action under § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior.*" *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Nonetheless, a § 1983 claim may be brought against a municipality where a "policy or custom" of the municipality deprived the plaintiff of his constitutional rights. *See id.* at 690–91, 98 S.Ct. 2018. To establish municipal liability, a plaintiff must show that an identified municipal policy or practice was the "moving force [behind] the constitutional violation." *Id.* at 694, 98 S.Ct. 2018. Furthermore, where, as here, the claims are against individual municipal employees in their official capacities, "there must be proof of such a custom or policy in order to permit recovery ... [because] such claims are tantamount to claims against the municipality itself." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (citing *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)).

 Where no municipal policy exists, "liability may nonetheless arise from 'a course of action tailored to a particular situation' by a municipal decision maker, provided that 'the decision maker possesses final authority to establish municipal policy with respect to the action ordered.'" *Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 231 (S.D.N.Y.2000) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). As the Second Circuit recently explained:

> Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather ... were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. It does not suffice for these purposes that the official has been granted discretion in the performance of his duties. Only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability.

> Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. The relevant legal materials[ ] include state and local positive law, as well as custom or usage having the force of law. The matter of whether the official is a final policymaker under state law is to be resolved by the trial judge before the case is submitted to the jury.

> [Moreover], the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the municipality's busi-

ness. Thus, the court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action.

*Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.) (internal citations, alterations and quotation marks omitted), *cert. denied,* 531 U.S. 813, 121 S.Ct. 47, 148 L.Ed.2d 16 (2000).

In support of his argument for municipal liability, plaintiff simply states that Kirchner is a final policymaker. (Pl. Mem. Opp. Summ. J. at 16.) With respect to Kirchner, defendants argue that no municipal liability attaches because plaintiff adduces no evidence to suggest Kirchner was motivated by plaintiff's alleged protected speech. (County Defs. Reply Mem. Supp. Summ. J. at 5–8.) With respect to the remaining defendants, defendants argue that the facts fail to implicate Yetter, Peterson and Smith.

▮ Although we find it likely that, at minimum, Kirchner had final policymaking authority, this Court does not have sufficient evidence to make such a determination as a matter of law. Neither party has submitted any evidence illuminating the extent to which the County delegated to defendants authority to make personnel decisions for the Department. More information is needed before a final determination can be made on this issue. Accordingly, defendants' motion for summary judgment on plaintiff's municipal liability claim must be denied without prejudice. *See Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 457 (N.D.N.Y.2001) (denying summary judgment without prejudice where the court did "not now have sufficient evidence to determine, as a matter of law, whether Defendants had policy making authority in the pertinent areas"); *Legal Aid Soc'y,* 114 F.Supp.2d at 233 (denying summary judgment with leave to renew on the question of municipal liability where the "possibility that the Mayor possess[ed] final policymaking authority ... [was] less than fully clear"); *Rucci v. Thoubboron,* 68 F.Supp.2d 311, 326 (S.D.N.Y.1999) (Conner, J.) (denying summary judgment on the issue of whether the defendant was a final policymaker because "the County has offered no evidence on this issue, and since the ultimate burden of showing the absence of a genuine issue of material fact resides with the movant"). We note, however, that the burden of demonstrating that defendants were final municipal policymakers will ultimately rest with plaintiff.

**E. *Qualified Immunity***

Defendants move to dismiss the individual liability claims against defendants on the grounds that they are entitled to qualified immunity under § 1983. For the following reasons, we disagree.

▮ As the Second Circuit has recently stated,

A government official sued in his individual capacity is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; or (3) if the defendant's action was objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken. These three issues should be approached in sequence, for if the second is resolved, the third becomes moot; a favorable resolution of the first moots both the second and the third.

*X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65–66 (2d Cir.1999) (internal citations and

quotations omitted). Here, there is no dispute that retaliation in response to protected First Amendment speech is contrary to clearly established federal law. Moreover, having already held that a jury may reasonably find that defendants unlawfully retaliated against plaintiff, it follows that the same jury may find that defendants did not act "objectively, legally and reasonably." *Id.* at 66. Therefore, we cannot decide as matter of law that defendants are entitled to qualified immunity and we deny defendants' motion for summary judgment on this issue.

### III. *42 U.S.C. § 1981*

■ Section 1981(a) provides, in pertinent part, that:

> (a) All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

To establish a § 1981 claim, plaintiff must prove that: (1) he is a member of a racial minority; (2) defendant intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). Plaintiff has failed to make any showing of race-based discrimination. In fact, there is no allegation of a race-based claim other then the cursory mention of § 1981 in the Complaint. Accordingly, plaintiff's claims for relief under § 1981 are dismissed sua sponte.

### CONCLUSION

For the reasons stated above, we grant summary judgment with respect to plaintiff's § 1981 claim and § 1983 First Amendment retaliation claims premised upon the speech relating to the length of the training period, the speech relating to the drug and alcohol screening form and the speech relating to the domestic violence training video. However, we deny defendants' motion for summary judgment as to plaintiff's § 1983 First Amendment retaliation claim premised upon the alleged speech concerning Kiryas Joel clients. The motions are denied with prejudice with the exception of defendants' motion for summary judgment on the basis of municipal liability, which is denied without prejudice.

SO ORDERED.