Ronald LIPTON, Plaintiff,

v.

COUNTY OF ORANGE, NEW YORK, H. Frank Bigger, Sheriff of Orange County, Antoinette Catletti, Administratrix of the Estate of Theodore Catletti, Deceased, and Thomas Madden, Defendants.

No. 02 CIV. 0891(WCC).

United States District Court, S.D. New York.

April 14, 2004.

O'Hare & O'Hare, P.C., Attorneys for Plaintiff, Poughkeepsie, NY, Stephen P. O'Hare, Esq., Of Counsel.

Catherine M. Bartlett, County Attorney for Orange County, Attorneys for Defendants County of Orange, New York and H. Frank Bigger, Theodore Catletti and Thomas Madden in Their Official Capacities, Goshen, NY, Matthew J. Nothnagle, Sr. Asst. County Attorney, Of Counsel.

Burke, Miele & Golden, LLP, Attorneys for Defendant H. Frank Bigger (in his Individual Capacity), Goshen, NY, Thomas K. McCarren, Esq., Of Counsel.

Appelbaum, Bauman & Appelbaum, Attorneys for Defendants Antoinette Catletti, Administratrix of the Estate of Theodore Catletti, Deceased, and Thomas Madden (in their Individual Capacities), Liberty, NY, Joel R. Appelbaum, Esq., Of Counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Ronald Lipton brought this action pursuant to 42 U.S.C. § 1983 against defendants the County of Orange (the "County"), a municipal corporation, and H. Frank Bigger, Thomas Madden and Antoinette Catletti as administratrix of the Estate of Theodore Catletti (collectively the "individual defendants") in their

individual and official capacities.[1] (Complt.¶¶ 8–9.) At all times relevant to the events on which this action is based, the individual defendants occupied the following positions with the County: (1) Bigger was the County's elected Sheriff; (2) Theodore Catletti was the County's corrections administrator, holding the rank of Colonel within the Sheriff's department; and (3) Madden was the assistant corrections administrator, holding the rank of Major within the Sheriff's department. (Id. ¶¶ 3, 5–6.) Plaintiff seeks compensatory damages from the County and compensatory and punitive damages from the individual defendants, claiming that defendants' actions with respect to his pretrial detention and release therefrom constituted a violation of his free speech, due process and equal protection rights secured by the First and Fourteenth Amendments to the United States Constitution.[2] (Id. ¶¶ 7, 29.) Specifically, plaintiff contends that defendants retaliated against him for his public criticism of police misconduct by causing or acquiescing in maltreatment by Sheriff's deputies who: (1) kept him in an unheated holding cell while he was wearing only thin jail-issue clothing; (2) deprived him of food and drink except for one sandwich and water given to him on the night he entered defendants' custody; (3) arbitrarily and capriciously changed his inmate classification and transferred him to the correctional facility on Riker's Island in New York City ("Riker's"), where Sheriff's deputies falsely informed the staff that he was a pedophile; (4) physically abused him while they transported him back to the jail from Riker's; (5) subjected him to an unjustified strip search prior to his release pursuant to an unconstitutional policy of strip searching all pretrial detainees; and (6) released him into cold weather with no jacket or money and refused him access to shelter or a telephone to call for help. (Id. ¶¶ 13, 14, 17, 20–24.)

Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56 dismissing plaintiff's Complaint in its entirety, arguing that: (1) the claimed misconduct was de minimis and thus not of a level necessary to support constitutional claims; (2) with respect to the County and the individual defendants in their official capacities, plaintiff has failed to prove that the alleged deprivations were pursuant to a County custom or policy; (3) plaintiff's claims fail to state an equal protection violation; and (4) the individual defendants were not personally involved in the alleged deprivations, and in any event would be entitled to qualified immunity for their actions. (Def. County Mem. Supp. Summ. J. at 12–21, 23–33, 37–38; Defs. Catletti & Madden Mem. Supp. Summ. J. at 6–13; Def. Bigger Mem. Supp. Summ. J. at 4–17.) The County also argues that plaintiff's damages should be limited to nominal or punitive damages because he has failed to make the showing of physical injury

---

1. We have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Unless otherwise stated, all references to "Catletti" herein are to Theodore Catletti.

2. Plaintiff also alleged that defendants' actions constituted cruel and unusual punishment in violation of the Eighth Amendment. (Complt.¶¶ 7, 29.) It is, however, well settled that with respect to pretrial detainees, "the environmental conditions of their confinement are properly reviewed under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth." Benjamin v. Fraser, 343 F.3d 35, 49 (2d Cir.2003). "This is because '[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime,' ... and thus, under the Due Process Clause, may not be punished in any manner—neither cruelly and unusually nor otherwise." Id. at 49–50 (citation omitted) (quoting Bell v. Wolfish, 441 U.S. 520, 535–37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

required by the Prison Litigation Reform Act (the "PLRA"), 42 U.S.C. § 1997e(e). (Def. County Mem. Supp. Summ. J. at 34–36.)

For the reasons set forth herein, we grant defendants' motion for summary judgment dismissing all claims contained in the Complaint, except for the retaliatory transfer claim. We deny the County's motion for summary judgment on the retaliatory transfer claim. We dismiss as redundant the retaliatory transfer claim against the individual defendants in their official capacities. We grant the motions for summary judgment of individual defendants Bigger and Madden dismissing the retaliatory transfer claim against them in their personal capacities. We deny the motion of defendant Catletti dismissing the retaliatory transfer claim against him in his personal capacity. Finally, we conclude that plaintiff may recover compensatory, nominal and/or punitive damages on the retaliatory transfer claim from defendant Catletti, and nominal and compensatory damages from the County.

## BACKGROUND

■ The record and the parties' submissions reveal the following facts.[3] Plaintiff is a 57 year-old resident of Newburgh, New York, a city that is located within the County. (Def. County Mem. Supp. Summ. J. at 2.) Plaintiff is currently employed as a part-time college boxing instructor,[4] but worked for various law enforcement agen-

3. We have gleaned the facts contained herein from the assertions contained in defendants' Local Rule 56.1 Statements and Memoranda, the citations to admissible evidence contained therein, and an independent review of the pleadings and record. We note with disapproval that plaintiff did not file with his response the required counter-statement admitting or denying these facts, a critical omission that is further compounded by plaintiff's failure to support the largely conclusory factual assertions in his Memorandum's statement of facts with citations to the record. This deficiency in the Memorandum is significant because to "to avoid penalizing parties harshly as a result of technical errors by their attorneys," we will look to that statement of facts as a stopgap alternative to a Local Rule 56.1 Statement. *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (Conner, J.). As a result, we accept as uncontested those facts averred by defendants that are supported by admissible evidence in the record. *Id.* at 504–05. We have, however, reviewed the non-conclusory factual assertions contained in the affidavits of plaintiff and Peter Matera, an Ulster County assistant district attorney, that are annexed to plaintiff's Memorandum of Law. We did, however, supplement the facts provided by defendants with additional details gleaned from our review of the source materials cited.

Moreover, we note that plaintiff's Memorandum opposing the motion for summary judgment is virtually devoid of legal argumentation, which is defined "as advanc[ing] one's contentions by connecting law to facts." *Sioson v. Knights of Columbus,* 303 F.3d 458, 460 (2d Cir.2002). As in *Sioson,* the argument section of plaintiff's Memorandum contains sparse recitations of various legal propositions, but fails to connect them to properly cited facts underlying this case. It is not our responsibility, especially in a counseled case, to form plaintiff's arguments for him by researching the record and relevant case law. *Id.* In the present case, however, we find the factual allegations sufficiently disturbing to warrant additional independent Court review to ensure that plaintiff is not unfairly penalized for inadequate briefing by counsel. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 133 (2d Cir.2004). That review leaves us satisfied that the conclusion herein is based on measurement of the facts of the present case against the high burden imposed on plaintiffs in such cases by well settled case law and not on any deficiency in the presentation by plaintiff's counsel.

4. Plaintiff has had a career in boxing that included stints as a sparring partner for prominent boxers including Muhammed Ali and Hurricane Carter, as well as work as a professional boxing referee licensed in various states at several levels of the sport. (Lipton 7/23/03 Dep. at 51–55, 85, 88; Lipton 7/25/03 Dep. at 140.)

cies in New York and New Jersey as a police officer and prosecutor's investigator from 1968 until 1987. (*Id.;* Lipton 7/23/03 Dep. at 35–51, 73.) Plaintiff has long been publicly critical, in the media and the courts, of the actions of numerous law enforcement agencies in the County and surrounding areas. (Complt.¶ 10.)

One such example of plaintiff's public criticism of local law enforcement was his lawsuit against the Walden Police Department ("Walden"), a village police department located in the County that had employed him for six months in 1986–1987. (Lipton 7/23/03 Dep. at 63–64.) Plaintiff, a Jewish man, left Walden because he discovered that another officer had drawn swastikas on plaintiff's ticket book and because he did not want to continue covering for the sheriff while the sheriff was having extramarital relations. (*Id.* at 64, 66–67.) Plaintiff stated that the Walden administration retaliated against him for his failure to assist in the sheriff's infidelities by not giving him work, and by not providing him with assistance in the field when he called for it. (*Id.* at 67–68.) In 1996, plaintiff brought a federal lawsuit against the village of Walden and its police department alleging police misconduct, harassment and anti-Semitism, which suit was resolved by a confidential settlement. (*Id.* at 97–98.) Plaintiff has brought numerous other actions against local entities that include pending suits against the Woodstock Police Department, another former employer, for false arrest and malicious prosecution, and the owner of the City of Newburgh's website for publication of allegedly defamatory statements. (*Id.* at 97, 99–100, 130.)

In August 1996, plaintiff complained about the hiring practices of the Village of Montgomery Police Department to a reporter who incorporated the complaints in an article published in the *Middletown* *Times–Herald.* (Complt.¶ 10.) The article discussed members of that police department who had also worked for the County Sheriff's department, and criticized a Montgomery practice that allegedly required its police officers to work for a private security company owned by Jack Byrnes, a Montgomery officer and Major in the County Sheriff's department. (*Id.; see also* Lipton 7/23/03 Dep. at 137–39.) Plaintiff learned of this requirement during a meeting with Byrnes prior to applying for a Montgomery police position, and testified at his deposition that he had informed Byrnes of his objection to that requirement as illegal. (*Id.* at 140.)

Thereafter, in November 1996, Larry Catletti, who is the son of defendant Catletti, a deputy in the County Sheriff's department and a part-time police officer for the Village of Montgomery, stopped plaintiff for speeding on Route 17–K in the Town of Montgomery. (Complt. ¶ 11; Lipton 7/23/03 Dep. at 143–46.) This traffic stop occurred shortly before plaintiff was to testify in his federal lawsuit against the Village of Walden. (Lipton 7/23/03 Dep. at 147–48.) Plaintiff testified that he asked Larry Catletti why he had been stopped, and Catletti answered that it was "for testifying against my friends, asshole." (*Id.; see also* Lipton 7/25/03 Dep. at 11.) When plaintiff realized who Larry Catletti was, he said "[y]our father works for a jail," to which Catletti replied that plaintiff "better never wind up there." (Lipton 7/23/03 Dep. at 148.) Larry Catletti then issued plaintiff a speeding ticket, and left the speed box blank. (*Id.*) The Montgomery Village Court subsequently dismissed the speeding ticket. (*Id.* at 150.)

Shortly thereafter, plaintiff both sent a letter to and called defendant Bigger expressing his concerns about the ticket and what Larry Catletti had said to him about

what would happen if plaintiff came to the County jail.[5] (*Id.* at 161.) Bigger stated that he would talk to Larry Catletti, and mentioned that defendant Ted Catletti was the jail administrator and was in the room with him. (*Id.* at 162.) Plaintiff also met alone with Bigger in person, and again expressed his concerns. (*Id.* at 163.) Bigger promised plaintiff that he would check into the allegations. (*Id.* at 164.) In a subsequent follow-up conversation, Bigger told plaintiff that he thought the ticket was unwarranted, but that there was nothing he could do about it.[6] (*Id.*) Plaintiff followed up again by sending Bigger a written letter in March 1997 reminding him of Catletti's threats; that letter was also sent to the New York State and New York City Departments of Corrections. (*Id.* at 165–66.) Plaintiff received no further response to that letter. (*Id.* at 166.)

Thereafter, on February 14, 1999, plaintiff and his son were arrested in Ulster County on a subsequently dismissed charge of criminal weapons possession[7] in the third degree in violation of N.Y. PENAL LAW § 265.02.[8] (Matera Aff. ¶ 1.) Pending bail, plaintiff was detained in the Ulster County jail until Ulster County officials transferred him to the custody of defendant County in the evening of February 17, 1999 on new charges of aggravated sexual abuse in the third degree in violation of N.Y. PENAL LAW § 130.66. (Complt. ¶ 13; Lipton 7/23/03 Dep. at 169–70, 173; Def. County Rule 56.1 Stmt., Ex. M.) Upon their arrival at the County jail, following the initial intake processing, plaintiff and his son were placed in a cold, unheated holding cell for approximately one hour although they were wearing only

**5.** Bigger's account of this conversation is not inconsistent with plaintiff's testimony. Bigger recalls the conversation, and states that he had advised plaintiff to take the issue up with the proper authorities, namely the police department that Larry Catletti was working for at the time that he issued the ticket. (Bigger Dep. at 15–17.)

This was not the first time that Bigger and plaintiff had met. Plaintiff approached Bigger in 1996 or 1997 and asked him to support his son Brett Lipton's application for the police academy, a request that Bigger accommodated by speaking to defendant Catletti, the official then responsible for such applications. (*Id.* at 6–7, 11–12.) Subsequently, plaintiff and Bigger met in passing at a restaurant in Newburgh where plaintiff was supposed to meet the boxer Joe Frazier. (*Id.* at 7–8.) Indeed, plaintiff introduced Frazier to Bigger later that evening. (*Id.* at 8.)

**6.** Plaintiff appears to treat the traffic stop by Larry Catletti as a background incident relevant to the dispute between the parties and not as an independent basis for relief. Indeed, as the County correctly points out, any such claims arising out of the November 1996 traffic stop are time-barred under § 1983 because the Complaint was dated February 1, 2002, and plaintiff knew or had reason to

know of any potential traffic stop-related civil rights claims when it occurred. (Def. County Mem. Supp. Summ. J. at 11–12.) *See, e.g., Scott v. Gardner,* 287 F.Supp.2d 477, 491 (S.D.N.Y.2003) ("The statute of limitations for civil rights actions commenced in New York under 42 U.S.C. § 1983 is the residual personal injury statute of N.Y. C.P.L.R. § 214(5) which provides that actions must be commenced within three years.").

**7.** Plaintiff testified that these weapons charges were filed shortly after he brought to the Saugerties police tape recordings of threatening anti-Semitic phone calls made to him by his then-girlfriend's brothers, one of whom he alleges is an active Ku Klux Klan member in addition to his work as a local corrections and part-time police officer. (Lipton 7/23/03 Dep. at 123–24, 167.)

**8.** The preliminary hearing was cancelled and plaintiff was released on February 17, 1999 after a police officer informed the assistant district attorney assigned to prosecute the case that he had made an outcome-determinative error in measuring the barrel of the shotgun at issue. (Matera Aff. ¶ 2.) Thereafter, on May 26, 1999, the Woodstock Town Court dismissed the charges on the prosecutor's application. (*Id.* ¶ 3.)

thin jail-issue garments. (Lipton 7/25/03 Dep. at 54–55, 61.) Plaintiff complained to nearby deputies about the cold, and of numbness in his chest and requested a blanket and medical attention, but was given neither. (*Id.* at 59, 61–62.) After approximately one hour, Joseph Ryan, a Captain in the Sheriff's department and shift commander for the evening, moved plaintiff and his son to a heated cell and provided them each with a sandwich and drinks.[9] (*Id.* at 73–74; *see also* Ryan Dep. at 12.) Plaintiff then thanked Ryan for "treating us as human beings." (Lipton *7/25/03 Dep.* at 75.)

The following morning, February 18, 1999, two officers approached the cell occupied by plaintiff and his son. (*Id.* at 82.) The officers, one of whom is named Kosmogiannis, informed them that plaintiff's son would be placed into the general inmate population,[10] and that plaintiff was " 'going somewhere else and that's the present from the colonel, from Colonel Catletti.' " (*Id.* at 83; *see also* Def. County Mem. Supp. Summ. J. 18.) They told plaintiff that he was being moved "as a

present from the colonel for giving his son a hard time." (Lipton 7/25/03 Dep. at 85.) The officers also stated that the "major and the colonel wanted [plaintiff] transferred somewhere else." (*Id.* at 86.) Plaintiff immediately asked to speak to Bigger, but the officers informed him that Bigger did not want to see him.[11] (*Id.* at 86–87.) Shortly thereafter, an unidentified officer came to the cell and told plaintiff that he was being transferred to Riker's as " 'a present from the colonel' " and because "the major and the colonel" want him sent there.[12] (*Id.* at 91–92.) The officer also told plaintiff that his classification had been changed and that "this jail can no longer house someone like you." (*Id.* at 92.) Later that morning, two Sheriff's deputies, Curtis and Price, transported plaintiff to Riker's. (*Id.* at 94; *see also* Lipton 8/5/03 Dep. at 43–44.) Plaintiff had no complaints about the car trip to Riker's. (Lipton 7/25/03 Dep. at 99–100.) It is undisputed that the transfer was made at Catletti's direction and approved by the State of New York.[13] (Def. County Rule 56.1 Stmt. ¶¶ 4–5, 8.)

9. As the County points out, plaintiff had been offered food on other occasions while in County custody, but refused to eat that food. (Def. County Rule 56.1 Stmt. ¶ 3.) At his deposition, plaintiff testified that he and his son were afraid to eat that food because of Catletti's presence at the jail. (Lipton 7/25/03 Dep. at 77–78.)

10. Plaintiff objected at the time to the movement of his son into the general inmate population because plaintiff's son is a police academy graduate who would likely be endangered by that move. (Lipton 7/25/03 Dep. at 82–83.) Plaintiff testified that his son was harassed, but unharmed after he was moved into the general inmate population. (*Id.* at 88.)

11. At his deposition, Bigger denied any involvement in Catletti's decision to transfer plaintiff to Riker's, and testified that he learned about that decision in a conversation with Catletti the week after it was made. (Bigger Dep. at 17–19.) Bigger did not in-

quire about the reason for the decision, and did not find it unusual. (*Id.* at 18, 22.)

12. Ryan testified at his deposition that Catletti called him at home on the morning that plaintiff was transferred to Riker's and expressed anger over any special treatment with respect to food that had been accorded plaintiff the previous evening. (Ryan Dep. at 17–18.) Ryan also testified that Catletti told him about the speeding ticket incident, and expressed his dislike for plaintiff. (*Id.* at 19.)

13. We note that Madden testified at his deposition that Catletti, as jail administrator, moved plaintiff from the County jail to Riker's because of his involvement in law enforcement-related controversies, several of which involved jail employees, and a desire to "move him for our protection in the liability matter so that we would have no direct control over his environment." (Madden Dep. at 16, 27.) Madden testified that he was not

Upon their arrival at Riker's, the County deputies transferred plaintiff to the custody of Riker's corrections officers. (Lipton 7/25/03 Dep. at 101.) Plaintiff noticed that the paperwork given to the Riker's officer contained a statement to the effect of "claims to have been a police officer, this is untrue, do not believe him." (*Id.*) We note that the transfer form submitted to the Court as part of the record states that plaintiff "claims to be retired police officer—information is unfounded." (Def. County Rule 56.1 Stmt., Ex. K.) Plaintiff also claims that he overheard the County officers tell the Riker's officers that he was a pedophile.[14] (Lipton 7/25/03 Dep. at 102.)

Plaintiff also testified that the Riker's officers asked the County officers when plaintiff's next court date was, and the County officers replied that there was no court date and plaintiff was to remain at Riker's indefinitely, despite the fact that the County officers had with them a form stating that plaintiff was scheduled for an appearance in the Newburgh Town Court on February 22. (*Id.*) Plaintiff then asked the Riker's officers to call the Newburgh court, and explained that the County officers were lying when they stated that he was not a former police officer, and was a pedophile. (*Id.*) After a brief discussion

between the Riker's officers, they called the court and learned of plaintiff's scheduled court date. (*Id.* at 103.) At this point, the County officers ran out of the building, despite the Riker's staff's request for them to stay, and the Riker's officers stated that " 'there is something very wrong here.' " (*Id.* at 103, 106.)

Plaintiff remained at Riker's until two County officers, Tim Mahoney and John Byman, picked him up on the evening of February 19, 1999. (Complt. ¶ 19; Lipton 8/5/03 Dep. at 5–6.) Plaintiff claims that prior to the car trip, Mahoney asked him, " '[s]o you're the Walden cop,' " to which plaintiff replied in the affirmative. (Lipton 8/5/03 Dep. at 6–7.) Plaintiff testified that Mahoney and Byman physically abused him during the car ride from Riker's to the County jail as Mahoney, the driver, slammed on the brakes hard, repeatedly and without cause, resulting in plaintiff's head and shoulders being slammed into the partition that separated the front and rear seats of the police car, causing him pain.[15] (*Id.* at 11, 13, 16.) Plaintiff testified that Mahoney "slammed on the brakes without any vehicle or traffic necessity about four times" early in the trip. (*Id.* at 14, 18.) Plaintiff was in handcuffs and ankle restraints during the trip and was not wearing a seat belt.[16] (*Id.* at 14–15.)

personally involved in the decision to move plaintiff, which was the province of Catletti as jail administrator and subject to state approval, and only became aware of the decision after plaintiff already had been moved. (*Id.* at 17–18, 31–35, 43.) Madden testified that the practice of interfacility transfers is not uncommon in the corrections field, and is often done when the staff of a particular jail has a conflict of interest with a particular prisoner. (*Id.* at 27.) He also stated that individuals have been moved from the County to Riker's on numerous occasions. (*Id.* at 29–30.) Madden testified that Riker's did not cost the County money, while other facilities such as Putnam County charged boarding expenses for other counties' inmates. (*Id.* at 34.) Ryan's testimony about such arrange-

ments was similar, and he specifically referred to an agreement between Riker's and the County for the mutual exchange of high risk inmates. (Ryan Dep. at 32–34.)

14. There is, however, no written notation to this effect on the transfer form.

15. This practice is known colloquially in law enforcement circles as "waffling," because of the "waffle" imprint that the metal screen partitions of older police cars leave on the prisoner's face. (Ryan Dep. at 22–23.)

16. Plaintiff testified that he received medical attention after the incident from a health center physician for red marks and a headache.

Upon his return to the County Jail, plaintiff learned that bail had been posted for him with the Newburgh Town Court by friends and relatives (Lipton 7/25/03 Dep. at 136, 144, 147) and that he was to be released. (Lipton 8/5/03 Dep. at 21.) Plaintiff then requested the return of his possessions that had been taken from him during the initial jail intake process; he then discovered that some were missing. (*Id.*) A young Sheriff's deputy then asked plaintiff to step into a corridor area, where he told plaintiff to take off all of his clothes for a strip search.[17] (*Id.* at 21–22.) When plaintiff asked why he was being strip searched, given that he just was in the custody of two deputies who had searched him before putting him the car, the officer stated: "'I hear you tape record cops. You give cops a hard time.'" (*Id.* at 22.) When plaintiff asked for a superior officer, the officer told plaintiff: "'Take off your clothes or you're never going to get out of the jail.'" (*Id.*) Plaintiff removed his clothes and bent over at the officer's request, but continued to complain, to which the officer responded: "'That's the way it is at OC Jail. You don't like it, don't come here.'" (*Id.* at 23–26.) Plaintiff then dressed in pants, a shirt, shoes and socks—his heavy jacket that he had worn at the time of his arrest had not been returned to him by the jail staff. (*Id.* at 27–28.)

Plaintiff then began to exit the jail. (*Id.* at 29.) While on his way out, he asked a Sheriff's employee to permit him to make a phone call to his son to get a ride home;

that request was denied. (*Id.*) Plaintiff then told the employee that he felt weak and sick, it was freezing outside and that he did not have a coat, and that he lacked change or a calling card; he asked the employee to either call plaintiff's son or allow him to wait inside.[18] (*Id.*) The employee responded by telling plaintiff to: "Get the fuck outside" and also denied plaintiff's request to see a supervisor. (*Id.* at 29–30.) Plaintiff testified that it was below 30 degrees that February night. (*Id.* at 30.) He attempted unsuccessfully to use the pay phone outside of the jail to call for a ride, and then tried to walk to the nearby Goshen Diner before he became dizzy and his knees gave out after approximately fifteen steps. (*Id.* at 31–32.) He went back to the phone and made another unsuccessful attempt to call his family. (*Id.* at 31.) Plaintiff then banged on the jail door, but personnel would not let him back in. (*Id.*) Plaintiff then blacked out, and he woke up to his son standing over him; his son subsequently removed him from the jail premises and took him home. (*Id.*) Thereafter, plaintiff commenced this action on February 1, 2002. (Complt.)

## DISCUSSION

### I. Standard of Review

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The

---

(Lipton 8/5/03 Dep. at 35–36.) The physician also treated him at the same time for general illness and weakness following his release from the County Jail. (*Id.* at 35.)

17. Plaintiff testified that the officer refused to identify himself and that he could not read the officer's name tag because he lacked his glasses. (Lipton 8/5/03 Dep. at 23–24.) Plaintiff described the officer as white, "tall

and slim and young" with short hair and facial acne. (*Id.* at 24.)

18. Defendants dispute this portion of plaintiff's deposition testimony and contend that plaintiff did not give the jail staff notice of his weakened condition at the time of his release. (Def. County Rule 56.1 Stmt. ¶ 11.)

burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994).

## II. Whether Plaintiff's Substantive Claims State Cognizable Constitutional Violations

With respect to the substance of plaintiff's claims, defendants, noting the traditional latitude that the courts accord to corrections officials in the administration of their facilities,[19] argue that any injury arising from plaintiff's cell temperature and food deprivation claims is *de minimis* and cannot form the basis of a constitutional violation. (Def. County Mem. Supp. Summ. J. at 12–16, 23–24.) Defendants also argue that the decision to transfer plaintiff to Riker's was supported by legitimate penological reasons and that there is no admissible evidence that it was an improper punitive or retaliatory transfer. (*Id.* at 16–22.) Finally, defendants also contend that they had no duty to plaintiff upon his release that would form the basis for a constitutional violation. (*Id.* at 24–26.) Plaintiff argues in response, albeit in a somewhat skeletal manner, that actions by prison officials taken in retaliation for the exercise of First Amendment rights are actionable, even if they are supported by otherwise legitimate reasons. (Pl. Mem. Opp. Summ. J. at 2–3.) We address these arguments in turn.

### A. Plaintiff's Cell Temperature, Food Deprivation, Strip Search and Post–Discharge Claims

In their Memorandum, defendants argue extensively that plaintiff's allegations in his Complaint arising from the cold cell temperature, the alleged food deprivation and his release in weakened condition into cold weather fail to state cognizable constitutional violations. (Def. County. Mem. Supp. Summ. J. at 12–16, 23–26.) Defendants argue similarly with respect to plaintiff's equal protection claim set forth in the *ad damnum* clause of the Complaint. (*Id.* at 37–38.) Defendants also argue that there is no evidence of custom or policy supporting plaintiff's claims with respect to the strip search. (*Id.* at 30–31.) Plaintiff does not address these arguments in his Memorandum, instead choosing to confine the rather sparse legal analysis therein to the alleged retaliatory transfer to

---

**19.** It is well settled that such deference applies in the administration of facilities that hold pretrial detainees, as well as those wherein convicted prisoners are confined. *See, e.g., Bell*, 441 U.S. at 547–48, 99 S.Ct. 1861 (noting that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

**446**

Riker's. (Pl. Mem. Opp. Summ. J. at 1–3.) Defendants argue in their Reply Memorandum that plaintiff, under this Court's decision in *Jessamy,* has abandoned any claim that these allegations amounted to actionable constitutional violations. (Def. County Reply Mem. Supp. Summ. J. at 1–2.)

■ This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed. *See, e.g., Jessamy,* 292 F.Supp.2d at 515 n. 21 (deeming abandoned claim of "racial profiling" in the employment discrimination context because the plaintiff failed to respond to the defendants' argument that no such cause of action exists); *see also Riley v. Town of Bethlehem,* 44 F.Supp.2d 451, 466 (N.D.N.Y.1999) ("Plaintiff does not address any of these claims in her opposition papers, leading me to believe that she has abandoned them."). Application of this proposition is, however, tempered by this Court's discretion and the maxim that " 'foolish consistency is reputedly the hobgoblin of little minds.' " *Nat'l Ass'n of Social Workers v. Harwood,* 69 F.3d 622, 627–28 (1st Cir.1995) (quoting Ralph Waldo Emerson, *Self Reliance, in* ESSAYS: FIRST SERIES (1841) and departing from "raise or waive" rule to review on appeal claims not raised in the trial court that presented a "matter[ ] of great public moment" that "touches upon policies as basic as federalism, comity, and respect for the independence of democratic institutions"); *see also Riverkeeper, Inc. v. United States EPA,* 358 F.3d 174, 203 (2d Cir.2004) (discussing Emerson quote in context of non-categorical environmental regulation).

■ We do conclude that plaintiff has abandoned any independent constitutional claims arising from the cold cell temperature, the alleged food deprivation, his alleged release in weakened condition into cold weather and the Equal Protection Clause. Nevertheless, the Complaint and plaintiff's Memorandum make clear that the gravamen of his claims is defendants' alleged retaliation for the exercise of his First Amendment rights. (Complt. ¶¶ 27, 29; Pl. Mem. Opp. Summ. J. at 2–3.) Moreover, plaintiff's briefing omission does not erase these factual events from the record—it means only that they cannot serve by themselves as independent factual predicates for constitutional claims. Accordingly, so long as plaintiff's allegations with respect to those events are supported by admissible evidence, they remain relevant proof of animus under the appropriate analytical step in the context of plaintiff's claims of retaliation for the exercise of First Amendment rights.

■ We treat plaintiff's claims with respect to the alleged pre-release strip search separately because, viewed in the light most favorable to plaintiff, those allegations present an appalling abuse of the power afforded to corrections officers that is too serious an affront to a decent society to dismiss solely on the basis of a briefing failure, without a review of their merit. *See Bell,* 441 U.S. at 560, 99 S.Ct. 1861 (concluding that strip and body cavity searches of pretrial detainees "must be conducted in a reasonable manner" and that abusive searches "cannot be condoned"); *cf. Franklin v. McCaughtry,* No. 02–C–618–C, 2004 WL 221982, at *8 (W.D.Wis. Feb.3, 2004) (granting summary judgment to defendants when prisoner plaintiff could not show "causal link" between a strip search and a lawsuit that he had filed against prison officials).[20] On

---

**20.** *See also Merritt v. Hawk,* 153 F.Supp.2d 1216, 1224–25 (D.Colo.2001) (stating that

"allegations of improper use of restraints, deprivation of food, improper strip searches, de-

their merits, we conclude, however, that the strip search claim cannot survive summary judgment because plaintiff has not proffered any evidence that retaliatory pre-release strip searches are a County custom or a policy[21] or that any named defendant had personal involvement in the strip search of plaintiff.[22] *See infra* Parts III., V. (discussing bases for § 1983 liability).

### B. *Plaintiff's Retaliatory Transfer Claims*

Defendants next argue that plaintiff's classification change and retaliatory transfer claims should be dismissed because: (1) there is no admissible evidence of an improper motive for the transfer; (2) a legitimate penological reason existed for the transfer; and (3) he had no state law-created liberty interest in avoiding the transfer. (Def. County Mem. Supp. Summ. J. at 16–22; Def. Bigger Mem. Supp. Summ. J. at 9–14; Defs. Catletti &

Madden Mem. Supp. Summ. J. at 10–12.) We address each contention in turn.

█ The Second Circuit has held that the transfer of an inmate, including a pre-trial detainee, " 'to less amenable and more restrictive quarters for nonpunitive reasons' is not a right protected by the due process clause itself." *Covino v. Vt. Dep't of Corr.*, 933 F.2d 128, 129 (2d Cir.1991) (per curiam) (quoting *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Moreover, "the due process clause is not implicated when a pre-trial detainee is transferred from one facility to another." *Id.* Prison officials retain broad discretion to transfer pretrial detainees, but "it is well settled that a transfer may not be made solely in retaliation for the exercise of constitutionally protected rights." *Butler v. Westchester County,* No. 94 Civ. 8216 SHS, 2000 WL 335539, at *6 (S.D.N.Y. Mar. 30, 2000); *see also Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir. 1998) ("A prisoner has no liberty interest in remaining at a particular correctional

privation of air and exercise, and theft and destruction of property that are insufficient to state a claim pursuant to the Eighth Amendment should be considered in light of plaintiff's retaliation claim"); *Burton v. Kuchel,* 865 F.Supp. 456, 468 (N.D.Ill.1994) (concluding that prisoner's First Amendment retaliation claim survived summary judgment when he introduced evidence of abuse and harassment, including frequent strip searches, that began after he filed a grievance against corrections officers).

21. Indeed, defendants have introduced evidence to the contrary. Madden testified that at his deposition that although there is a conceivable reason to search a prisoner returning to the Jail from Riker's because of the possibility of bringing in contraband from that facility, there is no procedure in place wherein an inmate is strip searched prior to release on bail, and that he would find that practice "unusual." (Madden Dep. at 78–79.)

22. The officer who performed the search is not a named defendant herein, and the three-year statute of limitations applicable to

§ 1983 claims and the operation of Fed. R. Civ. P. 15(c) renders futile an amendment to the Complaint at this point naming him because his omission was not by mistake, but because of lack of identifying information. *See, e.g., Barrow. v. Wethersfield Police Dep't,* 66 F.3d 466, 470 (2d Cir.1995) (stating that the plaintiff's "amended complaint identifying six police officers by name—filed, by any calculation, after the statute of limitations had run—did not correct a mistake in the original complaint, but instead supplied information [the plaintiff] lacked at the outset. Since the new names were added not to correct a mistake but to correct a lack of knowledge, the requirements of Rule 15(c) for relation back are not met."); *Polite v. Town of Clarkstown,* 198 F.R.D. 610, 612 (S.D.N.Y.2001) (following *Barrow* and holding that "any attempt to amend the Complaint at this late date would not relate back to the filing of the original Complaint" because plaintiffs did not know the identities of the individual officers that he sought to name); *see also supra* note 17.

facility, ... but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights." (citations omitted)); *Gardner*, 287 F.Supp.2d at 493 (concluding that there was a genuine issue of material fact as to a prisoner's claim that he was transferred in retaliation for complaints about urine tests when the plaintiff introduced evidence of the prison director's statements to him, as well as the fact that prisoners with worse disciplinary records were not transferred, and the defendant did not introduce evidence of a legitimate reason for the transfer).

We must approach plaintiff's retaliation claims " 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir.2003) (citation omitted). The burden-shifting process for evaluating First Amendment retaliation claims is well established by Second Circuit precedent:

> To establish a prima facie case of First Amendment retaliation, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." ... Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.... Regardless of the presence of retaliatory motive, however,

a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.... *Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive.*

*Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir.2003) (emphasis added; citations omitted) (citing, *inter alia, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). We note that defendants do not dispute that plaintiff, via his filing of lawsuits and participation in media interviews, has satisfied the first element of engaging in speech or conduct that is protected by the First Amendment. Moreover, defendants also do not argue that the transfer of plaintiff to Riker's was not an adverse action. Accordingly, we now turn to the burden shifting required to resolve the causation element of the retaliation analysis.

### 1. *Whether There is Admissible Evidence of an Improper Motive*

Defendants first argue that there is no admissible evidence of an improper motive for the transfer, thus dictating that summary judgment be entered in their favor.[23] Specifically, they contend that the statements of Officer Kosmogiannis and the unidentified corrections officers about Catletti's intentions are inadmissible hearsay not within the purview of FED. R. EVID. 801(d)(2)(D), which provides that "[a] statement is not hearsay if ... offered against a party and is ... a statement by

---

**23.** It is well settled that this Court need consider only admissible evidence in deciding a motion for summary judgment. *See, e.g., King v. Town of Wallkill*, 302 F.Supp.2d 279, 299 (S.D.N.Y.2004) (Conner, J.); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." (Def. County Mem. Supp. Summ. J. at 17–19.) Relying primarily on *Evans v. Port Auth. of N.Y.*, 192 F.Supp.2d 247, 263–65 (S.D.N.Y.2002), they argue that the statements are inadmissible under Rule 801(d)(2)(D) because the officers were low-level employees who were not part of the process by which the transfer decision was made. (*Id.* at 18.) We disagree with defendants and conclude that these statements are admissible evidence of a retaliatory motive under Rule 801(d)(2)(D).

■ Under Rule 801(d)(2)(D), a "sufficient foundation to support the introduction of vicarious admissions ... requires only that a party establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir.1992). The employee or agent's authority need not be the authority to make the statements, but rather must be "the authority to take action about which the statements relate." *Id.* at 538. In the employment context, it has been widely held that "a statement by a co-worker relating the alleged statement of a supervisor with decision-making authority concerns a matter within the scope of the co-worker's employment" for purposes of Rule 801(d)(2)(D) only when the declarant is the plaintiff's supervisor or has a "significant role in the employment decision at issue." *Evans*, 192 F.Supp.2d at 263–64.

Defendants rely on *Evans* for the proposition that "[s]tatements of low-level employees who were not part of the decision-making process are not admissible as vicarious admissions" under Rule 801(d)(2)(D). (Def. County Mem. Supp. Summ. J. at 18–19.) Defendants read *Evans* too broadly in its applicability to this case. In *Evans*, an employment discrimination case alleging racial discrimination and retaliation under Title VII and 42 U.S.C. § 1981, the plaintiff proffered as evidence in opposition to a summary judgment motion his own affidavit, with this statement: " 'Rodrigo Ortiz [a co-worker] told me that Ernesto Butcher [the manager] told him that I never would be promoted in the Tunnels, Bridges & Terminals Department so long as he had any control over TB & T because I had complained about racial discrimination and inculpated him as part of my complaint.' " 192 F.Supp.2d at 261. The court noted that Butcher's statement to Ortiz was admissible as non-hearsay circumstantial evidence of Butcher's state of mind. *Id.* at 262. The court stated that unless it was considered an admission, Ortiz's statement to plaintiff about Butcher's assertion was hearsay because it was out-of-court and offered for the truth of the matter of asserted, namely, that Butcher made the statement. *Id.* After reviewing the relevant authorities, the court concluded that, if offered by plaintiff, Ortiz's statement was inadmissible hearsay because "there is no evidence that Ortiz was plaintiff's supervisor, that he played a role in any relevant decision-making process, or that his alleged statement to plaintiff was related in any way to his duties for the Authority." *Id.* at 264.

Mindful of the discretionary nature of evidentiary rulings,[24] we find *Evans* distinguishable and defendants' reliance on it

---

24. *See, e.g., United States v. Jackson*, 335 F.3d 170, 176 (2d Cir.2003) ("The district court has broad discretion regarding the admission of evidence, and the court's evidentiary determinations will be reversed only if they are 'manifestly erroneous.' ").

overbroad. *Evans* is distinguishable because unlike the co-worker in that case, the declarant Kosmogiannis and the other corrections officers here had a "significant role in the ... decision at issue" because they clearly were acting within the scope of their employment at the County jail in executing the order of Catletti to transfer plaintiff to Riker's. Thus, although they may not have made the transfer decision, their participation was instrumental in its execution and their statements are admissible against the County under Rule 801(d)(2)(D). *See Sadrud–Din v. City of Chicago,* 883 F.Supp. 270, 272–74 (N.D.Ill. 1995) (concluding in § 1983 case that news reporter's testimony about statements made to him by non-party police officers was admissible under Rule 801(d)(2)(D) because "[a]ll of the officers quoted ... were employees of the Chicago Police Department at the time these statements were made" and "their statements concerned matters within the scope of their employment, including their working relationship with [the officer who killed the plaintiff]; observations of [his] physical and emotional condition on the job; and the way the police handled the various alleged abusive situations involving [the couple] at issue in this case."). Accordingly, we conclude that the corrections officers' statements clearly were related to their duties for the County and that they constitute admissible evidence of retaliatory or punitive intent under Rule 801(d)(2)(D). Thus, plaintiff has satisfied the initial part of his burden, especially when these statements are viewed in the factual context of the case as a whole.

## 2. *Whether Defendants Would Have Transferred Plaintiff to Riker's Irrespective of Any Retaliatory Motive*

Defendants next argue that even in the presence of admissible evidence of retaliatory motive, plaintiff's claim fails because there were proper reasons for the decision to transfer plaintiff. (Def. County Mem. Supp. Summ. J. at 19–20; Def. Bigger Mem. Supp. Summ. J. at 11–14.) Once plaintiff has introduced admissible evidence of a retaliatory motive, "[t]he burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Coughlin,* 344 F.3d at 288. The plaintiff's admissible evidence of retaliatory motive "creates a triable issue of fact unless defendants proffer an alternative basis for disciplining [the plaintiff] that would apply to him even if his version of the events were true." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996); *see also Coughlin,* 344 F.3d at 290 (stating although the plaintiff would have been punished for certain behavior, "it is not at all clear that [he] would have been punished to the same extent" absent the defendant's disciplinary report filed in alleged retaliation for the plaintiff's having filed a lawsuit against another corrections officer). The Second Circuit has, however, cautioned that "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994) (internal quotation marks omitted).

Defendants have proffered evidence tending to establish a non-retaliatory purpose for plaintiff's transfer to Riker's. At his deposition, Madden testified that he understood from post-transfer discussions with Catletti that Catletti petitioned the State for permission to transfer plaintiff to Riker's because of the potential for liability and conflicts occasioned by plaintiff's presence in the jail, given his history with

County law enforcement officers. (Madden Dep. at 16–17, 27, 31–34, 65–66.) Madden understood that Catletti wanted to eliminate any direct control that he had over plaintiff's environment in order to shield the County from any potential liability. (*Id.* at 16.) Madden also testified that transferring inmates to Riker's did not cost the County any money, while it would have had to pay board expenses to transfer plaintiff to a closer facility such as Putnam County. (*Id.* at 34.) He testified that numerous individuals were transferred to Riker's since 1992, but he was not sure if any were active or retired police officers like plaintiff. (*Id.* at 29–30.) *See also supra* note 13.

Based on this evidence, defendants argue that plaintiff was transferred to Riker's for the legitimate penological reason of avoiding litigation stemming from an already conflict-ridden situation, and doing so in a cost-effective manner. (Def. County Mem. Supp. Summ. J. at 20; Defs. Catletti & Madden Mem. Supp. Summ. J. at 5.) *See In re Soliman*, 134 F.Supp.2d 1238, 1257–58 (N.D.Ala.2001) (concluding that government's "asserted . . . interest in maintaining order and safety, . . . *avoiding litigation*, and . . . preserving life" were "legitimate penological objectives" that justified the nasogastric tube or intravenous force-feeding of an INS detainee (emphasis added)), *appeal dismissed*, 296 F.3d 1237 (11th Cir.2002); *cf. Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir.2003) (noting that "[a]voiding the expense of litigation is a legitimate governmental interest" in upholding a public library rule requiring patrons to wear shoes), *petition for cert. filed*, 72 U.S.L.W. 3580 (U.S. Mar. 5, 2004) (No. 03–1263).

■ We conclude that there is a genuine issue of material fact precluding a grant of summary judgment to defendants on the retaliation claim. Although defendants may have advanced a legitimate penological reason for plaintiff's transfer, we cannot say *as a matter of law* that defendants would have transferred plaintiff to Riker's absent a retaliatory motive. In this case, the very conduct offered to justify the transfer was the same constitutionally protected conduct that would have created the motive for the alleged retaliation. In other words, there was no basis for transferring plaintiff to Riker's which was independent of his protected conduct. To deny plaintiff a trial on what plainly is a jury question of pretext involving credibility would ensnare him in a Kafkaesque trap of circular reasoning. *See Graham*, 89 F.3d at 81 (concluding that a question of fact existed when the plaintiff's "punishment was either wholly retaliatory or it was not retaliatory at all" because the defendants perceived either that the plaintiff engaged in prohibited conduct of attempting to organize a prison work slowdown or that he was engaging in protected conduct of protesting the removal of showers, and retaliated against him for that protected conduct); *cf. Jordan v. Garvin*, No. 01 Civ. 4393LTSGWG, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004) (holding that search of cell to find written music recording contract after inmate had filed grievance challenging prison rule prohibiting inmate business transactions that precluded him from entering into contracts was not retaliatory because contract in question was contraband under relevant prison rules); *Jermosen v. Coughlin*, No. 9:86–CV–208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (granting summary judgment to defendants on plaintiff's retaliation claim because there was evidence demonstrating that "plaintiff in fact committed the prohibited conduct charged in the misbehavior report," the filing of which was the retaliatory act). Accordingly, we deny defendants' motion for sum-

mary judgment dismissing plaintiff's retaliation claim.

### III. Whether the Complaint Should be Dismissed Against the County and the Official Capacity Defendants Because Plaintiff Has Failed to Show a Custom or Policy of Retaliation or That Defendant Catletti is a Policymaker

■ Defendants next contend that the retaliation claim should be dismissed against the County and the individual defendants in their official capacities because plaintiff did not prove that there exists a municipal custom or policy of retaliation. (Def. County Mem. Supp. Summ. J. at 31.) Defendants also contend that plaintiff has not proven that defendant Catletti, the official who made the transfer decision, is a final policymaker whose decisions would give rise to municipal liability. (Id. at 32–33.) We deny defendants' motion for summary judgment dismissing plaintiff's claims against the County. We do, however, dismiss as redundant the claims against the individual defendants in their official capacities. See, e.g., Baines v. Masiello, 288 F.Supp.2d 376, 384 (W.D.N.Y.2003) (noting that "a suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent" and that "it would be redundant to allow the suit to proceed against the City of Buffalo and the individual city officials in their official capacities"); see also Jessamy, 292 F.Supp.2d at 509–10 (considering simultaneously official capacity claims and claims against the defendant city).

■ Section 1983 applies to municipalities and other local government units. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "[a] municipality may not be held liable in an action under § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of respondeat superior." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.1995) (citing Monell, 436 U.S. at 691, 98 S.Ct. 2018). Nonetheless, a § 1983 claim may be brought against a municipality when a "policy or custom" of the municipality deprived the plaintiff of his constitutional rights. See Zahra, 48 F.3d at 680–81. To establish municipal liability, a plaintiff must show that an identified municipal policy or practice was the "moving force [behind] the constitutional violation." Id. at 694. It is well settled that "[a]ctions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir.2003) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

### A. Whether the County Has a Custom or Policy of Retaliation

Defendants first contend that plaintiff has not alleged or proven that the County has a custom or policy of retaliatory transfers. (Def. County Mem. Supp. Summ. J. at 27, 31.) Indeed, the only evidence in the record of any such custom or policy are conclusory statements to that effect in plaintiff's affidavit, which aver: (1) "[t]he Orange County Jail has a custom or policy in effect wherein police officers who speak out against other police officers are harassed and physically abused"; (2) "[t]his policy or custom includes harassment and abuse of police officers incarcerated there who criticize the Sheriff of the County of Orange and the jail administrators"; and (3) "[a]t a minimum, the Orange County Jail has a policy in effect wherein I would be personally physically abused as a result

of my exercise of my First Amendment right to free speech." (Lipton Aff. ¶¶ 2–4.) Plaintiff supports these conclusory allegations of custom or policy only by citing examples of his own mistreatment by various jail personnel. (*Id.* ¶¶ 5–8.)

It is well settled that the "policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation," and that "[c]onstitutional deprivations actionable under § 1983 may be 'visited pursuant to governmental "custom" even though such custom has not received formal approval through the body's official decisionmaking channels.' " *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Nevertheless, plaintiff must prove that the allegedly violative practice is "persistent and widespread," and that the "actions of subordinate city employees" are "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco,* 971 F.2d at 870–71.

We conclude that plaintiff has not proven the existence of a municipal custom or policy of retaliatory transfer. "Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation." *McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 705 (S.D.N.Y. 1999). Moreover, for plaintiff's claims of custom or policy to survive summary judgment review, there necessarily must be evidence of the complained-of activity by defendants in similar circumstances outside of the present case. *See Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 122 (2d Cir.1991) (stating that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy"); *McAllister,* 49

F.Supp.2d at 706–07 (granting summary judgment to defendants on the policy or custom issue because plaintiff "points only to his own alleged beating, false arrest and denial of medical treatment and the Police Department's alleged conspirational 'cover up' as evidence of a New York City policy"); *see also infra* Part III.B. In the present case, plaintiff has not offered any evidence of retaliatory activity beyond conclusory statements supported only by his own alleged mistreatment at the hands of jail officials who occupied positions below the final policy-making level. Accordingly, we conclude that plaintiff has not proven the existence of a County custom or policy of retaliatory transfers.

**B.** *Whether Defendant Catletti Was a Final Policymaker Under § 1983*

Defendants next contend that Catletti, the jail administrator who made the decision to transfer plaintiff to Riker's, was not a final policymaker whose actions are considered a policy or custom leading to municipal liability under § 1983. (Def. County Mem. Supp. Summ. J. at 31–33.) They argue that as a matter of state law, the final policy maker at the jail was not Catletti, but rather Bigger, who was not involved in the transfer decision. (*Id.* at 32.) Plaintiff, relying on statements of fact in the Second Circuit's recent opinion in *Catletti ex rel. Estate of Catletti v. Rampe,* 334 F.3d 225 (2d Cir.2003), contends that Catletti was in fact the official finally responsible for the creation of policy at the County jail. (Pl. Mem. Opp. Mot. Summ. J. at 3.) On the basis of the present record, we cannot conclude that Catletti was not a final policymaker whose actions would create § 1983 liability for the County, which precludes summary judgment for defendants.

The record reveals the following additional undisputed facts relevant to this inquiry. At all relevant times, Catletti held the rank of Colonel and was jail administrator for the County. (Madden Dep. at 9.) Madden held the rank of Major and served as assistant jail administrator to Catletti, who was his immediate superior. (*Id.* at 17, 53.) Catletti in turn reported to Bigger, who was elected Sheriff of the County in 1995. (Bigger Dep. at 5.) Catletti was the official who made the decision to transfer plaintiff to Riker's. (Madden Dep. at 16.) Bigger did not learn about this decision until Catletti told him about it one week after it happened.[25] (Bigger Dep. at 17–18.) Catletti did not tell Bigger why he transferred plaintiff to Riker's, and he was not required by County policy or procedure to do so. (*Id.* at 22–23.) Bigger testified that Catletti would have been responsible for responding to complaints made by plaintiff to the state department of corrections. (*Id.* at 25.)

■■■■■■ "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony,* 339 F.3d at 139. Under the Supreme Court's decision in *Pembaur,* the official in question must "be responsible for establishing final government policy." 475 U.S. at 483, 106 S.Ct. 1292. In applying that standard, the Second Circuit has held that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.... An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983) (footnote and internal citation omitted). Ac-

cordingly, depending on the factual and legal circumstances of a particular case, an official may be considered a final policymaker even if that official does not occupy the highest position in the relevant chain of command. *See id.* at 45–46 (concluding in case wherein nursing director alleged transfer in retaliation for corruption and waste complaints that hospital executive director and municipal corporation's vice president for corporate affairs were final decisionmakers because they had the authority to take action against the plaintiff and the corporation's president referred personnel matters to them and did not inquire into the matter at issue). For liability to attach, however, the official's authority must be more than mere discretion in municipal operations. *Anthony,* 339 F.3d at 139–40 (concluding that a police sergeant, while having the discretion to handle particular situations in the field, lacks a sufficient role in the formulation of overall police department official policy to be considered a § 1983 final decision-maker); *see also Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.), *cert. denied,* 531 U.S. 813, 121 S.Ct. 47, 148 L.Ed.2d 16 (2000). Finally, "[w]hether the official in question possessed final policymaking authority is a legal question ... which is to be answered on the basis of state law." *Id.* The plaintiff bears the burden of proving as a matter of law that the official in question had final policymaking authority in the specific area or particular issue of municipal business. *Id.* at 57–58; *see also Iannillo v. County of Orange,* 187 F.Supp.2d 170, 187 (S.D.N.Y.2002) (Conner, J.) (denying municipal defendants' motion for summary judgment and concluding that it was likely that a social services commissioner had final policymaking authority, but that "this Court does not have sufficient evidence to

---

25. Madden testified that he learned of Catletti's decision within a few days after the trans-

fer occurred. (Madden Dep. at 33–34.) *See also supra* note 13.

make such a determination as a matter of law" because "[n]either party has submitted any evidence illuminating the extent to which the County delegated to defendants authority to make personnel decisions for the Department.").

Defendants rely primarily on the Second Circuit's decision in *Jeffes* for the proposition that the sheriff is *the* final policymaker at a New York county's jail. (Def. County Mem. Supp. Summ. J. at 32–33.) In *Jeffes*, a § 1983 case wherein the plaintiff corrections officers alleged that the defendant sheriff retaliated against them for reporting wrongdoing at the jail to the public and federal investigators, the sheriff argued that he was not the final policymaker because the civil service commission retained jurisdiction over personnel and employment matters. 208 F.3d at 51, 58–59. The Second Circuit rejected the argument and held that the county sheriff was the final policymaker "with respect to operations at the jail" for purposes of holding the county liable because the plaintiff's claims encompassed the operation of the jail and conditions therein, and not routine personnel issues. *Id.* at 51, 60. The court reviewed the relevant provisions of the state law governing jail administration and concluded:

> The bulk of plaintiffs' claims center on harassment, intimidation, threats, and endangerment of their lives. The County has pointed us to no provision of

State or local law that requires a sheriff to answer to any other entity in the management of his jail staff with respect to the existence or enforcement of a code of silence. We conclude that Sheriff Barnes was, as a matter of law, the County's final policymaking official with respect to the conduct of his staff members toward fellow officers who exercise their First Amendment rights to speak publicly or to inform government investigators of their co-workers' wrongdoing.

*Id.* at 61. Defendants appear to argue that under that *Jeffes*, Bigger, the elected Sheriff, is the only possible final policymaker for § 1983 purposes. We do not share their broad reading of that case. *Jeffes* only stated that the sheriff was the final policy maker in the circumstances of that case; nowhere in that decision does the Second Circuit say that there can be only one such actor in all other circumstances.[26] Indeed, defendants' reading is inconsistent with the Second Circuit's decision in *Rookard*, which states that the relevant inquiry is whether Catletti's decision is "at the time [it was] made, for *practical or legal reasons* ... the municipality's final decision" on the transfer. 710 F.2d at 45.

Accordingly, we conclude that we lack sufficient information at this time to make the legal determination that Catletti was not the final policymaker on the trans-

---

**26.** Accordingly, the discussion relied on by defendants in *Sheriff's Silver Star Ass'n v. County of Oswego*, 56 F.Supp.2d 263, 267 n. 6 (N.D.N.Y.1999), noting that "courts in this Circuit have found that New York counties can be liable for the decisions of the sheriff as final policymaker over issues related to jail operations" similarly does not definitively stand for the proposition that Catletti *never* would have been the final policymaker under § 1983. The discussion in *Merriweather v. Sherwood*, No. 77 Civ. 3421(AGS), 2002 WL 1066755, at *4 (S.D.N.Y. May 28, 2002) to the

effect that Catletti "was an administrative employee with no policy-making or budgetary authority" is similarly unhelpful because that case was not a § 1983 action and did not involve the requisite analysis. *Merriweather* deals instead with an attorney conflict issue, specifically whether Catletti's attorney in his suit against the County could also serve as class counsel for purposes of ensuring the County's compliance with a twenty-five year old consent decree governing conditions at the jail.

fer issue.[27] The record indicates that Catletti made the transfer decision alone, and that Bigger did not know about it until over a week later and when he did learn about it, he did not ask and was not told the reason for the transfer; apparently, Catletti was not required by either policy or practice to tell him. Moreover, neither plaintiff nor defendants have provided us with copies of local law or jail rules and procedures delineating the limits of Catletti's authority in the jail. On this motion for summary judgment, defendants have therefore not carried their burden of demonstrating as a matter of law that plaintiff cannot prove that Catletti's decision is "at the time [it was] made, for practical or legal reasons ... the municipality's final decision" on the transfer.[28] *Rookard,* 710 F.2d at 45. Accordingly, we deny defendants' motion for summary judgment dismissing plaintiff's claims against the County.

## IV. Limitation of Damages Under the Prison Litigation Reform Act

Defendants next contend that because plaintiff has introduced no evidence of physical injury, any damages recovery on his retaliatory transfer claim is limited to nominal and punitive damages by the PLRA, 42 U.S.C. § 1997e(e), and shall not include any compensatory damages. (Def.

County Mem. Supp. Summ. J. at 34–36.) Defendants also argue that as a matter of law, plaintiff cannot recover punitive damages from the County. (*Id.* at 36.) In response, plaintiff does not claim physical injury in his Affidavit or Memorandum, but rather argues that the physical injury requirement of the PLRA no longer applies to him because he was not incarcerated at the time that he brought this action. (Pl. Mem. Opp. Summ. J. at 2–3.)

Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Congress enacted the PLRA in 1996 "to curb the filing of frivolous lawsuits by prisoners." *Cox v. Malone,* 199 F.Supp.2d 135, 139 (S.D.N.Y. 2002), *aff'd,* 56 Fed. Appx. 43 (2d Cir.2003) (unpublished opinion). One method of effectuating this purpose was the imposition of the physical injury requirement of the PLRA, which requires the showing of a more than *de minimis* physical injury, *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999), and remains applicable even in those cases wherein the plaintiff alleges the violation of a constitutional right.

---

**27.** We note that plaintiff's reliance on the statement of facts in *Catletti* describing Catletti's policymaking responsibilities is inappropriate. (Pl. Mem. Opp. Summ. J. at 2.) *See Catletti,* 334 F.3d at 227 ("As administrator, Catletti developed prison policy, hired and trained prison personnel, managed inmate care and heard their complaints, and prepared prison budgets."). First, the adjudicative facts contained in the Second Circuit's opinion are inadmissible as evidence in this case because we may take judicial notice of a judicial opinion only to establish the existence of that opinion, and not for the truth of the facts recited therein. *See, e.g., S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.,* 181 F.3d 410, 426–27 (3d Cir.

1999). Second, even assuming the opinion's admissibility, the analysis in that case is in any event inapposite because it focused on the public employee speech balancing test under *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and not whether Catletti was a final policymaker whose actions would render the County liable under § 1983. *Catletti,* 334 F.3d at 229–31.

**28.** Plaintiff, however, retains the burden of proving this as a matter of law at trial before the case is submitted to the jury. *See, e.g., Jeffes,* 208 F.3d at 57–58; *Iannillo,* 187 F.Supp.2d at 187.

*Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002). If, however, the plaintiff alleges the violation of a constitutional right, the action is not entirely barred and the plaintiff may obtain injunctive or declaratory relief, and nominal or punitive, but not compensatory damages irrespective of any physical injury if he proves that violation. *Id.* at 418. Moreover, release from incarceration does not relieve a plaintiff from satisfying the physical injury requirement for claims brought post-release arising out of his incarceration. *Cox,* 199 F.Supp.2d at 140 ("The fortuity of release on parole does not affect the kind of damages that must be alleged in order to survive the gate-keeping function of section 1997e(e). Because plaintiff's suit alleges only emotional injuries, it is barred by the PLRA irrespective of his status as a parolee at the time of filing.").[29]

The PLRA does, however, not license corrections officials to engage in malicious and sadistic conduct against prisoners in retaliation for their exercise of well established constitutional rights. It is not an abrogation of § 1983 that eliminates completely the possibility of compensation for those individuals deprived of their constitutional rights by the outrageous conduct of government officials merely because those officials work at correctional facilities. Put differently, plaintiff's claims in the this case present allegations of serious constitutional violations that plainly are not the petty complaints at which the PLRA is aimed.[30] Thus, there is an exception to the aforementioned PLRA preclusion of compensatory damages in the absence of physical injury that is applicable to cases wherein the constitutional right that is allegedly violated arises under the First Amendment. Although § 1997e(e) applies to plaintiff's First Amendment retaliation claim, a First Amendment deprivation presents a cognizable injury standing alone and the PLRA "does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself." *Ford v. McGinnis,* 198 F.Supp.2d 363, 366 (S.D.N.Y.2001) (concluding that the PLRA was applicable to First Amendment claims, but also that it did not preclude an award of compensatory damages for the denial of a kosher meal to the plaintiff); *see Rowe v. Shake,* 196 F.3d 778, 781 (7th Cir.1999) (concluding that "[a] deprivation of First Amendment rights standing alone is a cognizable

**29.** Plaintiff's reliance on *Greig v. Goord,* 169 F.3d 165 (2d Cir.1999) for the proposition that the PLRA does not apply to prisoners who have been released from custody is misplaced. In that case, the Second Circuit held only that "litigants ... who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision." *Id.* at 167. As Judge Scheindlin pointed out in *Cox,* the Second Circuit's holding in *Greig* was limited to § 1997e(a), which is a procedural requirement that mandates exhaustion of prisoners' claims within the correctional system prior to bringing a federal court action. *Cox,* 199 F.Supp.2d at 140. In contrast, she noted that the physical injury requirement of § 1997e(e) "is a substantive limitation" whose "purpose is to weed out frivolous claims where only emotional injuries are alleged," a purpose that is "accomplished whether section 1997e(e) is applied to suits brought by inmates incarcerated at the time of filing or by former inmates incarcerated at the time of the alleged injury but subsequently released." *Id.*

**30.** The PLRA was enacted in response to "lawsuits seeking damages for 'insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety.'" *Shaheed–Muhammad v. Dipaolo,* 138 F.Supp.2d 99, 109 (D.Mass.2001) (quoting 141 CONG. REC. S14408–01, S14413 (Sept. 27, 1995) (statement of Sen. Dole)).

injury" and that the PLRA did not preclude a claim that "prison officials violated [the plaintiff's] First Amendment rights by interfering with the receipt of his mail"); *Cancel v. Mazzuca*, 205 F.Supp.2d 128, 138 (S.D.N.Y.2002) (holding on a motion to dismiss that PLRA § 1997e(e) was not an obstacle to prisoner's claim of First Amendment free exercise and retaliation violations even when he did not allege physical injury, but not addressing nature of damages available); *cf. Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir.1998) (concluding that prisoner in case alleging Establishment Clause violation "is not asserting a claim for 'mental or emotional injury,;" but rather that "[h]e is asserting a claim for a violation of his First Amendment rights" and " § 1997e(e) does not apply to First Amendment Claims regardless of the form of relief sought").[31] *But see Searles v. Van Bebber*, 251 F.3d 869, 876 (10th Cir.2001) (concluding that the plain language of § 1997e(e) "does not permit alteration of its clear damages restrictions on the basis of the underlying rights being asserted" and that the "underlying substantive violation ... should not be divorced from the resulting injury, such as 'mental or emotional injury' "), *cert. denied*, 536 U.S. 904, 122 S.Ct. 2356, 153 L.Ed.2d 179 (2002). The jury's ultimate calculation of the compensatory damages award may not, however, take into account any emotional or mental injury alleged to have been suffered by plaintiff. *Ford*, 198 F.Supp.2d at 366.

 Plaintiff has stated a cognizable claim that his First Amendment rights were violated when defendants allegedly transferred him to Riker's in retaliation for his lawsuits and media activities. *See supra* Part II.B. Accordingly, we conclude that plaintiff's recovery on his claim of transfer in retaliation for the exercise of his First Amendment rights may include compensatory, nominal and/or punitive damages from defendant Catletti, and compensatory and nominal damages from the County, from whom punitive damages may not be collected as a matter of law. *See, e.g., DiSorbo v. Hoy*, 343 F.3d 172, 182 (2d Cir.2003) ("The City's liability, however, is limited to [the plaintiff's] compensatory damages, as punitive damages may not be awarded against a municipality under *Monell*.").

## V. Whether Defendants Bigger and Madden Were Sufficiently Involved in the Decision to Transfer Plaintiff to be Held Personally Liable Under § 1983

Individual defendants Bigger and Madden next argue that we should grant summary judgment dismissing plaintiff's claim against them because they were not sufficiently personally involved in the decision to transfer plaintiff to Riker's to incur liability under § 1983. (Defs. Catletti & Madden Mem. Supp. Summ. J. at 6–8; Def. Bigger Mem. Supp. Summ. J. at 4–8.)

 It is well settled that to hold a defendant liable under § 1983 "for the deprivation of a protected liberty or property

---

31. In their Reply Memorandum, defendants rely heavily on Judge Scheindlin's decision in *Cox* in support of their position that the lack of physical injury precludes plaintiff from recovering compensatory damages under the PLRA. (Def. County Reply Mem. Supp. Summ. J. at 6–8.) We conclude, however, that *Cox* and the Second Circuit's decision in *Thompson* are distinguishable from the pres-

ent case because they were, respectively, excessive force and medical treatment cases that lacked First Amendment implications. Indeed, Judge Scheindlin, the author of *Cox*, also authored *Ford*, and held therein that First Amendment violations remain separately compensable, even under the PLRA. 198 F.Supp.2d at 366.

interest without due process, a plaintiff must also show that the defendants were personally involved in the unconstitutional conduct. There is no *respondeat superior* liability in § 1983 cases." *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995) (discussing *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Moreover, when a supervisor such as a prison superintendent is named as a defendant, that supervisor's involvement must be greater than "mere 'linkage in the prison chain of command'" to give rise to § 1983 liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985)). The Second Circuit has stated that the requisite personal involvement of a supervisor may be demonstrated

"in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring."

*Richardson,* 347 F.3d at 435 (quoting *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003)). Moreover, "'direct participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001) (footnote omitted) (concluding that a reasonable jury could not find knowledge of or actual participation in a retaliatory arrest by a supervisory police lieutenant when that lieutenant was present near the incident giving rise to the arrest in question, but had only told a subordinate officer to "handle" the incident and did not participate in the conversation preceding the arrest).

We conclude that Madden lacked the requisite personal involvement to be held liable for the alleged retaliatory transfer of plaintiff to Riker's. As the previously discussed undisputed facts reveal, Madden did not participate in the action, which was ordered in any event by Catletti, who was his supervisor. Madden also testified at his deposition that he did not learn of the transfer until after it had happened. Finally, there is no evidence of a policy or custom that would give rise to supervisory liability for Madden. *See also supra* Part III.A.

As to Bigger, we conclude that although he was Catletti's supervisor and occupied the top position on the jail's chain of command, he too lacked the requisite personal involvement in the transfer. The undisputed evidence shows that he did not learn of the transfer until the week after it was made, and did not inquire about the reason why it was made. As stated previously, there is no evidence of a policy or custom of retaliation. There was no opportunity for him to remedy the situation because he did not learn of it until after plaintiff had been released. Finally, plaintiff has not introduced any evidence of or made any arguments relating to gross negligence by Bigger in his supervision of Catletti. Accordingly, we grant summary judgment dismissing plaintiff's claims against Bigger and Madden in their personal capacities.

### VI. *Whether Catletti Would Be Entitled to Qualified Immunity for His Actions*

Defendants next argue that Catletti would have been entitled to qualified im-

munity for his actions with respect to the transfer of the plaintiff, even assuming that a constitutional violation occurred. (Defs. Catletti & Madden Mem. Supp. Summ. J. at 9–13.) "The qualified immunity doctrine shields 'government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir.1999) (omission in original) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The immunity protects the official not just from liability but also from suit on such claims, thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial." *Id.*

With respect to the substance of the qualified immunity doctrine:

[A] government official sued in his individual capacity ... is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law, ...; (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct, ...; or (3) if the defendant's action was "objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken."

*X–Men Sec.,* 196 F.3d at 65–66 (citations omitted) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favor-able resolution of the first moots both the second and the third." *Id.* at 66.

■ We already have concluded that there is a genuine issue of material fact as to whether Catletti's decision to transfer plaintiff was retaliation for plaintiff's exercise of his First Amendment rights and thus prohibited by federal law. *See supra* Part II.B. We also conclude that the second element cannot be satisfied because the right to exercise First Amendment freedom of speech without retaliation from corrections officials is clearly established under the ample and decades-old precedent reviewed herein. *See id.*

■ We further conclude that a genuine issue of material fact precluding summary judgment exists as to whether Catletti's action was "objectively reasonable." In the Second Circuit, "[w]here specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate." *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) (concluding that when the plaintiff, a deputy police commissioner, established a prima facie case of employment transfer in retaliation for exercise of his First Amendment free speech rights, evidence of retaliatory animus by defendant police commissioner sufficient to raise a triable issue of fact on the merits also precluded summary judgment on qualified immunity grounds); *see also Locurto v. Safir,* 264 F.3d 154, 168–69 (2d Cir.2001) ("But where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law."). Moreover, this limitation on the use of qualified im-

munity as a defense in retaliation cases is applicable to the actions of corrections officials.[32] *See Rivera v. Senkowski*, 62 F.3d 80, 85 (2d Cir.1995) (concluding that the district court correctly rejected a qualified immunity defense in a case alleging a retaliatory inmate classification change when the "record in its present state did not permit the court to say as a matter of law that the defendants' acts were objectively reasonable."). Accordingly, we deny defendants' motion for summary judgment dismissing the claims against Catletti on qualified immunity grounds.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. We grant defendants' motion for summary judgment dismissing all claims contained in the Complaint, except for that of retaliatory transfer. We deny the County's motion for summary judgment on the retaliatory transfer claim. We dismiss as redundant the retaliatory transfer claim against the individual defendants in their official capacities. We grant the motions of individual defendants Bigger and Madden dismissing the retaliatory transfer claim against them in their personal capacities. We deny the motion of defendant Catletti dismissing the retaliatory transfer claim against him in his personal capacity. Finally, we conclude that plaintiff may recover compensatory, nominal and/or punitive damages on the retaliatory transfer claim from defendant Catletti, and nominal

and compensatory damages from the County.

SO ORDERED.

---

**32.** Defendant Catletti's reliance on the proposition that there is no state right or law precluding the interfacility transfer of prison inmates is misplaced and unavailing. (Defs. Catletti & Madden Mem. Supp. Summ. J. at 12.) Indeed, there may be any number of legitimate penological reasons justifying the

transfer of an inmate to a different facility. The reliance on this proposition, however, misstates and evades the central issue of this case, namely whether the transfer of plaintiff to Riker's was made in retaliation for plaintiff's exercise of his First Amendment rights.